IN THE SUPREME OF THE STATE OF CALIFORNIA

|  |  |
|---|---|
| IN RE THE MATTER OF<br><br>**DAVID LEON**,<br><br>On Habeas Corpus. | No._____<br><br>(Former Supreme Court Nos. S148275 and S148256)<br><br>(Court of Appeal Nos. H030074 and H028370)<br>(Santa Clara County Superior Court No. EE223464) |

PETITION FOR WRIT OF HABEAS CORPUS
AND BRIEF IN SUPPORT THEREOF
_____

SIXTH DISTRICT APPELLATE PROGRAM

DALLAS SACHER
Assistant Director
State Bar #100175
100 N. Winchester Blvd., Suite 310
Santa Clara, CA 95050
(408) 241-6171
DALLAS@SDAP.ORG

Attorneys for Petitioner,
DAVID LEON

IN THE SUPREME OF THE STATE OF CALIFORNIA

|  |  |
|---|---|
| IN RE THE MATTER OF<br><br>**DAVID LEON**,<br><br>On Habeas Corpus. | No._____<br><br>(Former Supreme Court Nos. S148275 and S148256)<br><br>(Court of Appeal Nos. H030074 and H028370)<br>(Santa Clara County Superior Court No. EE223464) |

TO THE HONORABLE RONALD GEORGE, CHIEF JUSTICE OF THE STATE OF CALIFORNIA, AND TO THE HONORABLE ASSOCIATE JUSTICES OF THE COURT:

Petitioner, David Leon, by and through his attorney, Dallas Sacher, respectfully petitions this court for a writ of habeas corpus and by this verified petition sets forth the following facts and causes for the issuance of said writ:

I.

Petitioner is presently unlawfully confined by the Director of Corrections at the California state prison in Susanville, California. Petitioner is serving a sentence of 40 years to life which was unlawfully imposed by the Superior Court for Santa Clara County in case number EE223464 on January 18, 2005.

II.

This petition is being filed in this court pursuant to its original habeas corpus jurisdiction.  (California Constitution, Article VI, section 10.)

III.

Following the imposition of judgment in the Superior Court, petitioner took an appeal in H028370.  On October 20, 2006, the Court of Appeal affirmed the judgment.  A timely petition for review was taken in S148256. The petition was denied on February 7, 2007.

IV.

While his case was pending in the Court of Appeal, petitioner filed a petition for writ of habeas corpus in H030074.  The petition raised a claim of ineffective assistance of trial counsel due to counsel's failure to argue the contents of CALJIC No. 5.50.1 during his closing argument.  (A copy of the petition has been lodged with this court as Exhibit A.)

V.

In order to avoid unnecessary duplicating costs, petitioner will rely on the record on appeal in H028370.  This court can obtain the record by calling it up from the Court of Appeal.  Petitioner respectfully requests this court to take judicial notice of the record.  (Evidence Code sections 452, subd. (d)(1), 453 and 459.)

VI.

- 2 -

On December 26, 2003, petitioner was charged in an information filed in the Superior Court for Santa Clara County.  (CT 749-752.)  In count one, petitioner was charged with murder (Penal Code section 187).  (CT 750.)  In count two, petitioner was charged with shooting at an occupied motor vehicle (Penal Code section 246).  (CT 750.)  Gun use enhancements (Penal Code section 12022.53) and gang enhancements (Penal Code section 186.22) were charged as to both counts one and two.  (CT 750-751.)  In count three, an assault with a deadly weapon was charged (Penal Code section 245).   (CT 751.)

On May 19, 2004, petitioner filed a motion to dismiss count three pursuant to Penal Code section 995.  (CT 770-783.)  On May 28, 2004, the motion was granted.  (CT 802.)

VII.

On September 15, 2004, a jury trial commenced.  (CT 836-837.)  On October 14, 2004, the jury returned its verdicts.  (CT 1078.)  On count one, petitioner was acquitted of first degree murder, but convicted of the lesser included offense of second degree murder.  (CT 1078.)  Petitioner was also convicted on count two (shooting at an occupied vehicle).  (CT 1078.)  The gun use enhancements were found true.  (CT 1078.)  The gang enhancements were found untrue.  (CT 1078.)

VIII.

The basic facts of the case are undisputed. The decedent, Enrique Hernandez, was a Sureno gang member. Late one evening, Mr. Hernandez assaulted petitioner on the street without provocation. Immediately thereafter, Mr. Hernandez summoned his gang colleagues and they chased petitioner as he ran home.

Upon arriving home, petitioner retrieved a gun and returned outside with his brother and a friend. When Mr. Hernandez and his crew advanced, petitioner fired a single shot in the air. Mr. Hernandez and his group departed.

Subsequently, petitioner stood guard outside his home as at least two separate vehicles drove by suspiciously. Eventually, Mr. Hernandez stopped in a car driven by his girlfriend. Mr. Hernandez exited the car and began to hit and/or shoot the window of a vehicle owned by petitioner's neighbor. Petitioner ran towards Mr. Hernandez. After Mr. Hernandez returned to his car and his girlfriend began to drive away, petitioner fired a single shot into the passenger door of the vehicle. Mr. Hernandez was killed.

IX.

With regard to petitioner's conviction for second degree murder, the jury was instructed on two theories: (1) malice murder; and (2) felony murder. The record does not reveal which of the theories was employed by the jury in

- 4 -

returning its conviction for second degree murder.

X.

On his appeal in H028370, petitioner was represented by attorney Dallas Sacher.  Among other contentions, Mr. Sacher argued that the trial court had erred by instructing on second degree felony murder for four separate reasons: (1) the underlying felony of shooting at an occupied vehicle "merged" with the killing and conviction was precluded under the "collateral purpose" doctrine; (2) it was error to omit an instruction on the "collateral purpose" doctrine since it is an element of the offense of second degree felony murder; (3) the second degree felony murder rule is unconstitutional since it is a common law crime which this court had no power to create; and (4) the second degree felony murder rule creates an improper irrebuttable presumption regarding the statutorily required element of malice.  (AOB in H028370, pp. 50-66.)  All of these arguments were advanced in petitioner's petition for review.  (Petition for Review in S148256, pp. 14-24.)

XI.

On August 1, 2007, petitioner filed a petition for writ of habeas in the federal district court.  A copy of the petition has been lodged with this court as Exhibit B.  In his petition, petitioner has renewed the arguments which were made in state court regarding his conviction for second degree felony murder.

- 5 -

XII.

In seeking a conviction for second degree felony murder in this case, the prosecutor relied on the underlying felony of shooting at an occupied vehicle (Penal Code section 246). While petitioner's appeal was pending, the only appellate opinion on point held that the offense of shooting at an occupied vehicle does not "merge" with the killing. (*People v. Tabios* (1998) 67 Cal.App.4th 1.)

XIII.

After petitioner's appeal was concluded, a new Court of Appeal opinion took issue with *Tabios*. In *People v. Bejarano* (2007) 149 Cal.App.4th 975, mod. 150 Cal.App.4th 305c, the court disagreed with *Tabios* and held that the "merger" rule applies when the offense of shooting at an occupied vehicle is the felony underlying a conviction for second degree felony murder. (*Id.* at p. 993, fn. 9.)[1]/ Recently, a second Court of Appeal has agreed with *Bejarano*. (*People v. Chun* (Sept. 14, 2007, C049069)__ Cal.App.4th __ [2007 Cal.App. Lexis 1537].

XIV.

In reaching its conclusion, the *Bejarano* court looked to this court's

---

[1]In the final version of the opinion, the discussion of *Tabios* will appear in footnote 10 pursuant to the later modification of the opinion. (*Bejarano*, supra, 150 Cal.App.4th 305c.)

analysis in *People v. Robertson* (2004) 34 Cal.4th 156.  In *Robertson*, this court held that the offense of negligently discharging a firearm (Penal Code section 246.3) will "merge" with the killing when the defendant lacks a "collateral purpose" other than assaulting the victim.  (*Id.* at p. 171.)

The holding in *Robertson* is in contrast with that in *People v. Hansen* (1994) 9 Cal.4th 300.  There, this court declined to apply the "merger" and "collateral purpose" doctrines with regard to the offense of shooting at an inhabited dwelling.  (*Id.* at p. 315.)

XV.

Petitioner was improperly convicted of second degree felony murder. The record establishes that petitioner lacked a collateral purpose when he shot the victim since he fired directly at him.  (ACT 40.)  Pursuant to the decisions in *People v. Bejarano*, supra, 149 Cal.App.4th 935 and *People v. Chun*, supra, 2007 Cal.App. Lexis 1537, the trial court committed reversible error by instructing on second degree felony murder.  To the extent that an instruction on second degree felony murder was proper, the trial court erred by failing to instruct the jury concerning the collateral purpose element of the offense.

///

XVI.

Assuming that this court has not abrogated the holding in *People v.*

- 7 -

*Hansen*, supra, 9 Cal.4th 300, petitioner has been deprived of his right to equal protection under the Fourteenth Amendment to the United States Constitution and Article I, section 7 of the California Constitution. At present, the state of the law is that there are two classes: (1) those defendants who are not entitled to use of the "collateral purpose" doctrine (e.g. defendants charged with shooting at an occupied vehicle or inhabited dwelling); and (2) those defendants who are entitled to application of the "collateral purpose" rule (e.g. defendants charged with the negligent discharge of a firearm). There is no rational basis for this discrimination. As a result, petitioner was deprived of the equal protection of the laws when he was convicted of second degree felony murder.

## XVII.

When he prepared petitioner's appellate briefs, attorney Dallas Sacher gave no consideration to raising an equal protection claim. (Exhibit C.) Mr. Sacher had no tactical reason for failing to raise the issue. (Exhibit C.)

## XVIII.

Petitioner was deprived of the effective assistance of appellate counsel guaranteed to him by the Fourteenth Amendment to the United States Constitution and by Article I, section 15 of the California Constitution. The ineffective performance by appellate counsel occurred when he failed to raise

an equal protection claim on appeal.  If appellate counsel had raised such an issue, the conviction for second degree felony murder would have been reversed.

XIX.

The second degree felony murder rule is unconstitutional and should be abrogated.  The rule is violative of the separation of powers clause of the California Constitution since the judiciary has no power to enact a crime. (California Constitution, Article III, section 3.)    The rule is also unconstitutional since it creates an improper irrebutable presumption concerning the element of malice in violation of the Fifth and Fourteenth Amendments to the federal Constitution.

XX.

Petitioner has no plain, speedy or adequate remedy other than by this petition.

WHEREFORE, petitioner prays that this court:  (1) take judicial notice of the transcripts, files, briefs, motions and records in H028370; (2) issue an order to show cause to the Director of Corrections to inquire into the legality of petitioner's confinement; (3) issue an order for the taking of such evidence as may be necessary for the proper consideration of the petition; (4) issue the writ and vacate petitioner's conviction for second degree murder; and (5) grant

petitioner whatever alternative or further relief as may be appropriate in the

interests of justice.

Dated: September _____, 2007                    Respectfully submitted,


                                                _____
                                                DALLAS SACHER
                                                Attorney for Petitioner,
                                                David Leon

<u>VERIFICATION</u>

I am an attorney licensed to practice in the State of California.  I am the attorney of record for petitioner.

Petitioner is unable to make this verification because he is absent from Santa Clara County due to his confinement in the state prison at Susanville, California.  For this reason, I am making this verification on petitioner's behalf.

All facts alleged in the above petition for a writ of habeas corpus, not otherwise supported by citations to the record or the exhibits submitted to this court, are true of my own personal knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _____ day of September, 2007, at Santa Clara, California.


_____
DALLAS SACHER

## STATEMENT OF FACTS

On the evening of November 15, 2002, Kimiko Rodriguez was in the company of her boyfriend, Enrique Hernandez. (RT 54.) After going to a 7-11 to buy beer, Ms. Rodriguez and Mr. Hernandez went to Pilo's house at the corner of Fair Oaks and East Taylor in Sunnyvale. (RT 54-55.) According to Sunnyvale Police Lieutenant Timothy Ahearn, the address was known as a "crash pad" for Sureno gang members. (RT 1164.) Indeed, Mr. Hernandez had belonged to the Sureno gang SST for "some years." (RT 1132.)

Ms. Rodriguez wanted to go home and eventually prevailed upon Mr. Hernandez to accompany her. (RT 56-57.) While driving on Fair Oaks, Ms. Rodriguez passed a Stop and Go. (RT 57.) Mr. Hernandez yelled to someone on the sidewalk and alighted from the car while it was still moving. (RT 58.) Mr. Hernandez approached the person on the sidewalk and a fight ensued. (RT 59.) The person in question was petitioner. (RT 61.)

Mr. Hernandez punched petitioner in the face and knocked him to the ground. (RT 60.) Petitioner crawled away, got to his feet and ran down the street. (RT 60.) Mr. Hernandez pursued petitioner. (RT 63.) Mr. Hernandez was joined in the pursuit by two men who had been standing at the corner. (RT 64-65.) As he ran, Mr. Hernandez whistled for additional support. (RT 66, 70.) Eventually, another man and a woman joined Mr. Hernandez' group.

(RT 67, 70-71.)  The group ended up on America Street where Mr. Hernandez was "yelling at some houses."  (RT 70.)

Various percipient witnesses offered differing accounts as to the number of people who were with Mr. Hernandez at the time.  Jesse Bynum placed the number at ten to twelve people (RT 591-593, 1938); Chris Leon indicated that there were two carloads of people and others on foot and bicycle (RT 798-799); Jose Alcazar testified that there were four people with Mr. Hernandez (RT 940-941); Jennifer Leonard testified that there were five or six people (RT 259); Cheuritta Cox placed the number of people at five (RT 1988).

As Mr. Hernandez' group congregated on the street, petitioner entered his parents' home at 366 America Street.  (RT 241, ACT 13-14.)  Petitioner returned to the street where he was joined by Chris Leon and Jesse Bynum. (RT 796.)  Petitioner fired a shot into the air and Mr. Hernandez' group left. (RT 943-945.)

Following the action on America Street, Ms. Rodriguez drove Mr. Hernandez back to Pilo's residence.  (RT 72-73.)  Ms. Rodriguez left Mr. Hernandez at Pilo's home and returned to her mother's house.  (RT 73-74.)

In the next two hours, suspicious vehicles cruised by 366 America Street.  According to the account of Chris Leon, the vehicles included a

Honda, a primered truck and a primered Impala.  (RT 820.)  Mr. Leon saw the

vehicles "coming up and down the street plenty of times" with their lights off.

(RT 820.)

At approximately 2:15 a.m., Ms. Rodriguez returned to Pilo's home and

picked up Mr. Hernandez.  (RT 75.)  Ms. Rodriguez drove to America Street

at Mr. Hernandez' request.  (RT 81.)  Mr. Hernandez was upset because

somebody had twice shot at his friend Lupe.  (RT 179.)

As Ms. Rodriguez drove down America Street, she turned off her

headlights and used only her parking lights.  (RT 82, 88.)  At Mr. Hernandez'

request, Ms. Rodriguez stopped by a Ford truck.  (RT 82.)  Mr. Hernandez got

out of the car and began hitting the window of the truck.  (RT 82-84.)

At that point, petitioner appeared in the middle of the street and ran

towards Mr. Hernandez.  (RT 89.)  Mr. Hernandez jumped in the car and

urged Ms. Rodriguez to drive away.  (RT 87.)  Insofar as petitioner was

running directly at her car, Ms. Rodriguez either braked or took her foot off

the gas.  (RT 88.)  Petitioner moved to the right side of the car.  (RT 88.)  Ms.

Rodriguez heard a bang.  (RT 89.)  As Ms. Rodriguez drove away, Mr.

Hernandez announced that he had been shot.  (RT 93.)

Ms. Rodriguez drove to Pilo's house.  (RT 94.)  After noticing that Mr.

Hernandez' chest was dripping blood, Ms. Rodriguez took him to the hospital.

- 14 -

(RT 95.)  Mr. Hernandez died at the hospital.  (RT 96.)  Mr. Hernandez'
autopsy revealed a blood alcohol level of .09 to .11 and the presence of
methamphetamine in his blood.  (RT 1701, 1703.)

Following Mr. Hernandez' demise, the police seized Ms. Rodriguez'
car.  A bb gun was found on the passenger floorboard.  (RT 200-201, 229.)
In addition, 75 bb pellets were found in Mr. Hernandez' shirt pocket.  (RT
842.)

At 6 a.m., Officer Tracy Hern saw petitioner emerge from 366
America.   (RT 499.)    Subsequently, Detective Kathryn Debeaubien
transported petitioner downtown in the company of Omar Guzman.  (RT
1002.)  During the course of the ride, petitioner told Mr. Guzman that "he hid
in the bushes and watched while Hernandez's friends drove up and down the
street pointing at the Leon residence."  (RT 1010.)  Petitioner also stated that
he "shot at the car once, at the passenger side of the car.  Once at Enrique
Hernandez, but at the time he didn't know that he had actually struck him with
a bullet."  (RT 1019.)

Officer Robert Ciano examined the passenger side door of Ms.
Rodriguez' car.  (RT 198.)  He found a bullet hole that was "58 degrees from
a horizontal plane perspective to the curvature of the door."  (RT 200.)  In
layman's terms, the shot was fired in a downward direction.  (RT 212.)  The

shot entered the door just below the window. (People's Exhibit 5.) Criminalist Eric Barloewen testified that the shot had been fired from a distance greater than two feet. (RT 670-672.)

Officer Robert Scott searched the house at 366 America Street. (RT 393- 394.) Officer Scott found a .9 millimeter pistol which had been secreted underneath a couch in the living room. (RT 394.) Officer Scott also found two .9 millimeter casings on the street. (RT 404, 406.) According to Mr. Barloewen, the casings found on the street had been fired from the .9 millimeter gun found at 366 America Street. (RT 669-670.)

Lieutenant Tim Ahearn was qualified as an expert "in the field of criminal street gangs." (RT 11.) Lieutenant Ahearn opined that petitioner was "affiliated" with the Vario Via Sol gang (VVS). (RT 1148.) In this regard, petitioner has a "smile now cry later" tattoo which is a "common tattoo for gang members." (RT 1142-1143.) In addition, petitioner had previously identified himself as a Norteno to Detective Anderson and had been seen with "Norteno gang members." (RT 1140-1141, 1148.)

Lieutenant Ahearn testified that a known VVS member, Edgardo Cisneros, had been found in possession of the taped interview of petitioner's neighbor, Cheuritta Cox. (RT 1149.) As a result, Lieutenant Ahearn drew the inference that petitioner had an "ongoing association with Vario Via Sol."

- 16 -

(RT 1149.)

Lieutenant Ahearn also noted that petitioner had rented a room in a house with Sam Gonzales. (RT 1147.) Insofar as Mr. Gonzales possessed a red bandanna which said "Norte," Lieutenant Ahearn opined that petitioner's association with Mr. Gonzales showed that he was a gang member. (RT 1147-1148.)

As its final piece of evidence, the government introduced the statement which petitioner had given to Detective Anderson on the morning after the shooting. Petitioner indicated that he had gone drinking with his girlfriend, Margaret, and his brother, John. (ACT 7.) At approximately 12 a.m. to 1 a.m., petitioner and his companions took a taxi to his parents' house. (ACT 8.) Insofar as he was quarreling with Margaret, petitioner took a walk around the corner. (ACT 9.)

As petitioner was walking down the street, he was accosted by some "Mexican dudes." (ACT 9-10.) When one of the "dudes" threw a punch at him, petitioner backed up since he did not want to fight. (ACT 10-11.)

Petitioner ran away from the confrontation. (ACT 11.) As he fled, petitioner encountered his brother Chris and Jesse Bynum. (CT 11.) Petitioner and Chris went home as did Jesse. (ACT 12.)

At first, petitioner told Detective Anderson that he remained inside his

house for the remainder of the evening.  (ACT 12-13.)  When Detective Anderson indicated that he did not believe this aspect of his account, petitioner admitted that he had retrieved his gun and gone back outside.  (ACT 13-14.)  When petitioner saw that a group of six to eight potential assailants had gathered, petitioner fired a single shot in the air.  (ACT 14-15.)  At that point, the group fled.  (ACT 17.)

Once again, petitioner told Detective Anderson that he retired to his house and stayed inside for the balance of the night.  (ACT 19.)  However, as before, petitioner changed his story after Detective Anderson indicated that he did not believe him.  (ACT 19.)

In his revised account, petitioner stated that he saw both a truck and a Honda Civic come by his house.  (ACT 21.)  Petitioner recognized the Civic as having been involved in the earlier altercation.  (ACT 21.)  Eventually, petitioner was standing outside in the bushes with Jesse Bynum and Cary Arnold.  (ACT 24, 32.)  Petitioner saw the Civic return and a "Mexican dude" get out and begin banging on his friend's truck.  (ACT 25.)  It sounded to petitioner as if Mr. Hernandez was using sparkplugs or a bb gun.  (ACT 26-27.)

Petitioner ran towards Mr. Hernandez.  (ACT 28.)  Mr. Hernandez got into the Civic which swerved in petitioner's direction.  (ACT 34.)  However,

petitioner did not believe that the driver was trying to hit him.  (ACT 34.)  As the Civic went by, petitioner shot at the door.  (ACT 29.)  In firing a single shot, petitioner aimed for "the bottom half of the door" because he " didn't want to shoot him in the head . . . ."  (ACT 40.)  When petitioner was informed that Mr. Hernandez had died, he was shocked.  (ACT 41, RT 1400-1401.)

Petitioner indicated that he tossed his gun into some bushes after the shooting.  (ACT 37.)  However, as was noted above, the gun was found underneath a couch in the home of petitioner's parents.  (RT 394.)

Jesse Bynum largely corroborated petitioner's story.  According to Mr. Bynum, both a truck and a Honda Civic slowly drove by the Leon residence during the course of the evening.  (RT 637.)  When the Civic stopped, Mr. Hernandez began banging on the window of a truck which is owned by Mr. Bynum's father.  (RT 610, 626.)  It appeared that Mr. Hernandez was employing a "gun-shaped object."  (RT 608.)  As the banging continued, petitioner ran towards Mr. Hernandez on the sidewalk "in a low crouch." (ACT 68.)  Mr. Bynum did not see the  shot fired by petitioner although he saw the flash of the gun in the corner of his eye.  (ACT 68.)

After the shooting, Mario Ojeda was walking by petitioner's house. (RT 952.)  Petitioner and Mr. Bynum came out and told him to get inside

- 19 -

before he got shot.  (RT 953.)  As Mr. Bynum later told the police, petitioner told Mr. Ojeda: "These fools are trippin' I had to dump on them."  (ACT 69.)

Defense Case

David Medina was 20 years old at the time of trial.  (RT 1537.)  Mr. Medina admitted that he had previously been a member of VVS in his younger days.  (RT 1541.)  However, petitioner was not a member of the gang.  (RT 1610.)

Mr. Medina went to school with Mr. Hernandez.  (RT 1618.)  He recounted an incident which had occurred six years earlier.  (RT 1618-1619.)

During the lunch recess, Mr. Medina was in the school parking lot by himself.  (RT 1618-1619, 1621.)  Accompanied by ten to twenty people, Mr. Hernandez approached Mr. Medina and ordered him to remove his shirt.  (RT 1624-1625.)  Mr. Medina declined to do so and turned his back.  (RT 1630.)  Mr. Hernandez attacked Mr. Medina.  (RT 1630-1631.)  Mr. Hernandez shoved a garbage can into Mr. Medina's face.  (RT 1632.)  Mr. Medina became dazed and went to the hospital for treatment.  (RT 1635-1636.)

Omar Guzman testified regarding the conversation that he had with petitioner as they were being transported to jail by Officer Debeaubien. Petitioner told Mr. Guzman that he had been harassed by three people in a bar. (RT 1716.)  As a result, he went home.  (RT 1716.)  Subsequently, petitioner

- 20 -

saw a truck without headlights coming down his street. (RT 1717.) When he saw a gun pointed at his house and himself, petitioner fired two shots. (RT 1717, 1725.) When the gun was pointed at him, petitioner heard clicking noises. (RT 1730.)

Mr. Guzman was impeached with the fact that he had suffered a prior felony conviction for assault against Jose Alcazar. (RT 1720-1721.) In addition, Officer Debeaubien testified on rebuttal that she had not heard any of the statements which Mr. Guzman recounted. (RT 2003.)

Travis Cox is a friend of petitioner. (RT 1811.) Mr. Cox testified that petitioner is neither a gang member nor is he a violent person. (RT 1817.)

Ryan Light was employed along with petitioner as a window washer. (RT 1824.) Mr. Light opined that petitioner is not a violent person. (RT 1825.)

Judy Stahmer is one of petitioner's neighbors. (RT 1845.) Ms. Stahmer asserted that petitioner is honest and non-violent. (RT 1848.)

Todd Rudy is one of petitioner's neighbors. (RT 1857.) Mr. Rudy believes that petitioner is honest and non-violent. (RT 1858.)

Stanley Stovall works with petitioner's brothers at Mahoney Print Service. (RT 1922.) Mr. Stovall believes that petitioner is honest and non-violent. (RT 1923-1924.)

Derrick Stahmer engraved several tattoos on petitioner. (RT 1832.) The "smile now cry later" tattoo which he placed on petitioner also appears on the cover of an album by Motley Crue. (RT 1837.)

<u>INTRODUCTION</u>

This case presents this court with an opportunity to clarify the presently confused nature of the case law regarding the second degree felony murder rule. Indeed, clarification is compelled since the present state of the law raises a fundamental problem under the equal protection clause.

It is a fair reading of the law that the "merger" doctrine applies to some offenses (e.g. negligently discharging a firearm) but not others (e.g. shooting at an inhabited dwelling). (Compare *People v. Robertson*, supra, 34 Cal.4th 156, 171 and *People v. Hansen*, 9 Cal.4th 300, 315.) Indeed, the Court of Appeal cases are in conflict as to whether the "merger" rule applies to the offense of shooting at an occupied vehicle. (Compare *People v. Bejarano*, supra, 149 Cal.App.4th 975, 993, fn.9 and *People v. Tabios*, supra, 67 Cal.App.4th 1, 11.) However, these conflicts cannot be tolerated under the equal protection clause.

The criminal law must be neutral in its application and discrimination among criminal defendants must be rational. As will be fully discussed below, there is quite simply no plausible rationale which allows for the "collateral

purpose" rule to apply in only some second degree felony murder cases. As a result, this court must intercede in order to definitively announce that the rule applies in all such cases.

Even if this court is unwilling to go this far, petitioner is nonetheless entitled to a remedy in order to avoid a fundamental miscarriage of justice. When petitioner's case was previously before this court, the only extant authority held that the act of shooting at an occupied vehicle did not implicate the "merger" rule. (*Tabios*, supra, 67 Cal.App.4th 1.) Subsequently, two better reasoned opinions have disagreed with *Tabios*. (*Bejarano*, supra, 149 Cal.App.4th 975; *People v. Chun*, supra, 2007 Cal.App. Lexis 1537.) In the interests of justice, this court should intercede to provide a remedy to petitioner.

I.

THE SECOND DEGREE MURDER CONVICTION SHOULD BE REVERSED PURSUANT TO *PEOPLE v. BEJARANO*, supra, 149 Cal.App.4th 975 and *PEOPLE v. CHUN*, supra, 2007 Cal.App. Lexis 1537.

The trial court instructed the jury that petitioner could be convicted of second degree murder on either of two theories: (1) the killing was committed with malice; or (2) the killing occurred during the commission of the felony of shooting at an occupied vehicle. (RT 2035-2039.) The prosecutor argued both theories to the jury. (RT 2086-2091.) As will be demonstrated below,

- 23 -

it was error to allow the jury to consider the felony murder theory.

A.    The Rather Tortured History of The Merger Doctrine.

As a matter of California common law, "an unlawful killing in the commission of a felony that is inherently dangerous to human life" constitutes second degree murder.  (*People v. Robertson*, supra, 34 Cal.4th 156, 164.) However, not every dangerous felony allows for the use of a second degree felony murder theory.  Rather, in some cases, the felony "merges" with the killing such that the doctrine does not apply.

The genesis of the merger doctrine is *People v. Ireland* (1969) 70 Cal.2d 522.  There, the jury was instructed that the felony of assault with a deadly weapon would support a second degree felony murder conviction.  The court found that reversible error had occurred since the underlying felony was such an "integral part of the homicide" that it was "included *in fact* within the offense charged."  (*Id.* at p. 539, fn. omitted.)  Thus, *Ireland* stands for the proposition that second degree felony murder cannot be found when the underlying felony "merges" with the killing.  The rationale for the rule is that it is improper to bootstrap every felonious assault into a murder since such a result would circumvent the general legislative requirement that malice is an element of murder.  (*Ibid.*)

In *People v. Mattison* (1971) 4 Cal.3d 177, the court further elaborated

on the "merger" doctrine. There, the defendant was charged with the felony of putting poison in a drink (Penal Code section 347). In concluding that the felony did not merge with the killing, the court held that a felony murder conviction was proper since the felony had been committed with a "'collateral and independent felonious design.' [Citation.]" (*Id*. at p. 185.)

In *People v. Hansen*, supra, 9 Cal.4th 300, the court appeared to consign the *Mattison* test to the dustbin of history. In *Hansen*, the defendant was charged with shooting at an inhabited dwelling house (Penal Code section 246). In holding that the felony did not merge with the killing, the court stated that the "collateral and independent felonious design" standard was not "the critical test determinative of merger in all cases . . . ." (*Id.* at p. 315.) Rather, the court found that shooting at an inhabited dwelling house is not a felony which will "elevate all felonious assaults to murder or otherwise subvert the legislative intent" that malice should ordinarily be required for a murder conviction. (*Ibid.*)

Recently, the court has backtracked from the holding in *Hansen* and once again applied the *Mattison* test. In *People v. Robertson*, supra, 34 Cal.4th 156, the defendant was charged with the negligent discharge of a firearm (Penal Code section 246.3). While acknowledging that *Hansen* had indicated that "the collateral purpose rationale may have its drawbacks in

- 25 -

some situations [citation]," the court nonetheless held that the test provided the "appropriate framework" to consider whether a section 246.3 violation could properly support a second degree felony murder conviction. (*Id*. at p. 171.)

In *People v. Randle* (2005) 35 Cal.4th 987, the court applied the collateral purpose rule. There, the defendant and his cousin committed an auto burglary. Upon witnessing the crime, Brian Robinson and Charles Lambert chased the defendant's cousin and beat him. The defendant then shot and killed Mr. Robinson. The jury was instructed that it could return a second degree felony murder conviction based on the defendant's act of negligently discharging his gun (Penal Code section 246.3). Applying the collateral purpose rule, the court found that the underlying felony merged with the killing since the defendant had no criminal purpose other than shooting at the victim. (*Id.* at p. 1005.)

As the foregoing resume of the case law reveals, it is less than clear whether the "collateral purpose" rule is to be applied in all second degree felony murder cases or whether it is to be selectively applied in only some cases. On the one hand, it is a fair reading of *Robertson* that the rule is to be uniformly applied. Indeed, this was the understanding expressed by Justices Kennard and Werdegar. (*Robertson*, supra, 34 Cal.4th at p. 180 (dis. opn. of Kennard, J.); Id at p. 185 (dis. opn. of Werdegar, J.).) On the other hand, it

- 26 -

must be conceded that the majority opinion in *Robertson* did not expressly overrule the holding in *Hansen* where the collateral purpose rule was not applied.

In a recent opinion, the Second District appears to have assumed that the collateral purpose rule applies in all cases. In *People v. Bejarano*, supra, 149 Cal.App.4th 975, mod. 150 Cal.App.4th 305c, the defendant was charged with second degree felony murder on the theory that he had shot at an occupied vehicle in violation of Penal Code section 246. An earlier Court of Appeal opinion had held that the same crime allowed for use of the second degree felony murder doctrine. (*People v. Tabios*, supra, 67 Cal.App.4th 1.) In reversing the judgment, the *Bejarano* court applied the collateral purpose rule and refused to follow *Tabios* on the grounds that the *Tabios* court had not discussed whether "the defendant had a collateral and independent felonious purpose." (*Bejarano*, supra, 149 Cal.App.4th at p 993, fn. 9.)

Importantly, the *Bejarano* court went one step further and also noted that in "*Hansen*, unlike the present case, there was no evidence that the defendant intended to commit an assault." (*Bejarano,* supra, 149 Cal.App.4th 975, 993, fn. 9.) The implication to be drawn from this comment is that the *Bejarano* court believed that *Hansen* is no longer controlling authority to the extent that *Hansen* held that the collateral purpose rule does not apply in a

- 27 -

case involving an act of shooting at an inhabited dwelling in violation of Penal
Code section 246.

Recently, the Third District agreed with the analysis in *Bejarano*.
(*People v. Chun*, supra, 2007 Cal.App. Lexis 1537.)  In so doing, the *Chun*
court held that the operative rule is that the collateral purpose rule applies to
"an assaultive-type crime, such as when shooting at a person is involved . . .
."  (*Id*. at pp. 32-33 at slip opinion.)

Given the uncertainty in the case law, it is impossible to say whether
this court presently believes that the collateral purpose rule must be applied
in all cases.  However, appellant is entitled to a remedy in this case under the
well reasoned decisions in *Bejarano* and *Chun*.

     B.     <u>Pursuant to the Collateral Purpose Rule, The
Judgment Must Be Reversed.</u>

In *People v. Bejarano,* supra, 149 Cal.App.4th 975, the prosecutor
proceeded on a second degree felony murder theory based on the underlying
felony of shooting at an occupied vehicle.  The factual support for the theory
was the defendant's admission to the police that he had fired at an occupied
car in order to hit the gang members who were inside.  After carefully
reviewing the various Supreme Court cases on the second degree felony
murder rule, the court held that the collateral purpose rule applied.  (*Id*. at p.
990.)  This was so because the defendant admitted to police "that he

committed assault with a firearm against the occupants" of the car.  (*Ibid.*)

The identical analysis applies here.  By his own admission, petitioner fired his gun directly at the door of the automobile in which the decedent was riding.  (ACT 29, 40.)  Indeed, a photograph shows that the bullet entered the door just below the window.   (People's Exhibit 5.)   Under these circumstances, it was error to instruct on felony murder since petitioner plainly lacked any collateral purpose for committing the section 246 violation. (*Bejarano*, supra, 149 Cal.App.4th at p. 990.)

*People v. Chun*, supra, 2007 Cal.App. Lexis 1537 reached the same result as *Bejarano*.  There, the defendant fired directly into an occupied car at a stoplight.  The court applied the collateral purpose rule and held that the felony murder rule did not apply since "the reasonable inference is that one who shoots another at close range intends to harm, if not to kill. [Citation.]" (*Id*. at p. 33 of slip opinion.)

The contrary holding in *People v. Tabios*, supra, 67 Cal.App.4th 1 should not be followed.  There, the court failed to engage in any analysis of whether the collateral purpose rule applied.  Rather, the court held only that the reasoning of *People v. Hansen*, supra, 9 Cal.4th 300 was directly on point. (*Id*. at p. 11.)  However, this is quite simply untrue.

*People v. Hansen*, supra, 9 Cal.4th 300 involved the offense of shooting

- 29 -

at an inhabited dwelling.  However, this crime is substantially different from the offense of shooting at an occupied vehicle.  While the former offense does not require that anyone be present (*Hansen*, supra, 9 Cal.4th at p. 310), the crime of shooting at an occupied vehicle does.  Thus, the *Tabios* court erred in believing that *Hansen* was the determinative authority.

Moreover, as *Bejarano* noted, the holding in *Tabios* preceded this court's reliance on the collateral purpose rule in *Randle*.  (*Bejarano*, supra, 149 Cal.App.4th at p. 993, fn. 9.)  Thus, *Tabios* is an outdated authority which should no longer be followed.

In its opinion, the Court of Appeal indicated that the record established that petitioner had a collateral purpose.  (Opinion, p. 24.)  This conclusion is based on a misreading of the record which was pointed out in a petition for rehearing.  (Petition for Rehearing, pp. 7-9.)

In its opinion in this case, the Court of Appeal read the record as showing that petitioner "never admitted that he committed an assault by shooting at Hernandez."  (Opinion, p. 24.)  This is purportedly so since petitioner "claimed that he fired at the bottom half of the door of the Civic and *that he did so because he did not want to hit Hernandez*."  (Opinion, p. 24.)  The emphasized language misstates the record.

Contrary to the court's assertion, petitioner made no representation that

he lacked the intent "to hit" Mr. Hernandez.  Rather, petitioner said that he "didn't want to shoot him in the head . . . ."  (ACT 40.)  This is a materially different statement from the one reported in the court's opinion.

With regard to the last point, the transcript of petitioner's statement sets forth his comment that "I wasn't trying to . . . him, and all this shit - you see I wasn't trying to do all this shit, you know what I'm saying."  (ACT 40.) Appellate counsel has repeatedly listened to the audiotape of the statement. (People's Exhibit 15.)  In counsel's view, neither the word "hit" nor the word "him" can be heard on the audiotape.  Thus, nothing in the record establishes that petitioner stated that he did not intend "to hit" Mr. Hernandez.  (Opinion, p. 24.)

In any event, it was beyond the scope of the Court of Appeal's power to render a determination as to petitioner's mental state.  It was a question for the jury as to whether petitioner had a collateral purpose.  (See pp. 34-37, infra.)  As has been shown above, there was ample evidence from which the jury could have found that appellant intended to assault Mr. Hernandez.  Thus, the Court of Appeal erred in substituting its judgment for that of the jury.

Turning to the question of prejudice, the jury was instructed on two theories of second degree murder: (1) malice murder; and (2) felony murder. Since the felony murder theory was erroneous as a matter of law and the

record does not show that the jury relied on the legally correct theory, reversal is compelled under the due process clause of the federal Constitution. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1128-1129; *People v. Smith* (1984) 35 Cal.3d 798, 808; *Sandstrom v. Montana* (1979) 442 U.S. 510, 526; *Pulido v. Chambers* (9th Cir. 2007) 487 F.3d 669, 675-676; *Martinez v. Garcia* (9th Cir. 2004) 379 F.3d 1034, 1039.)

It should be noted that *People v. Bejarano,* supra, 149 Cal.App.4th 975 applied the generic beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18. (*Id*. at pp. 989-990.) In so doing, the court misread the controlling case law.

In *People v. Smith*, supra, 35 Cal.3d 798, the jury was instructed on second degree malice murder and second degree felony murder. After finding that it was error to instruct on felony murder, the court reversed under the authority of *People v. Green* (1980) 27 Cal.3d 1 and *People v. Henderson* (1977) 19 Cal.3d 86. (*Id*. at p. 808.) As those cases made clear, per se reversal is required unless the record shows that the jury relied on a legally proper theory. (*Green*, supra, 27 Cal.3d 1, 73-74 and fn. 66; *People v. Henderson* (1977) 19 Cal.3d 86, 96.)

Here, the record contains not a shred of evidence that the jury relied on the malice murder theory in convicting appellant. As a result, the judgment

must be reversed.  (*Smith*, supra, 35 Cal.3d 798, 808; see also *Sandstrom v. Montana*, supra, 442 U.S. 510, 526 [when the jury is instructed on an erroneous legal theory, reversal is required unless the record shows that the jury relied on a legally correct theory].)

Significantly, *Chun* properly recognized that per se reversal is required in this situation.  (*Chun*, supra, 2007 Cal.App. Lexis 1537, p. 34 of the slip opinion.)  Thus, reversal is required here as well.

Assuming that this court is inclined to employ the *Chapman* standard, it is the People's burden to establish that the error was harmless beyond a reasonable doubt.  (*Chapman*, supra, 386 U.S. 18, 24.)  The People cannot carry their burden in this regard.

In his statement to the police, petitioner indicated that he had no intent to kill.  (ACT 40.)  Rather, petitioner specifically aimed at "the bottom half of the door" because he "didn't want to shoot him in the head . . . ."  (ACT 40.)  On this record, it simply cannot be said that the jurors would have necessarily found that petitioner acted with express or implied malice.

*People v. Bejarano*, supra 149 Cal.App.4th 975 is instructive on this point.  There, the defendant admitted "that he pointed his gun at the Oldsmobile's occupants and intended to shoot them."  (*Id*. at p. 991.)  Nonetheless, there was a lack of evidence that the defendant had "carefully

aimed at the Oldsmobile's occupants when he fired." (*Ibid*.) On this record, the court concluded that the improper instruction on felony murder was prejudicial since "a jury reasonably could have concluded that the issue of whether appellant harbored malice (express or implied) was not reasonably free from dispute." (*Id*. at p. 992.)

The same is true here. Petitioner plainly disclaimed any intent to kill the decedent. Moreover, he maintained that he fired in a manner to avoid killing the decedent. Thus, the jury may well have concluded that the malice element of second degree murder was not proved beyond a reasonable doubt.

In short, the determinative question is whether "the jury reasonably could have convicted [petitioner] of second degree murder based on felony murder and not express or implied malice . . . ." (*Bejarano*, supra, 149 Cal.App.4th 975, 990.) As petitioner has shown, this question must be answered in the affirmative. The murder conviction must be reversed.

C.    <u>The Judgment Must Be Reversed Since The Jury Was Not Given An Instruction Regarding The Collateral Purpose Rule.</u>

In instructing the jury on the elements of second degree felony murder, the trial court gave no instruction regarding the collateral purpose rule. (RT 2036-2038.) This omission constitutes reversible error.

As is well settled, the trial court has the duty to instruct *sua sponte* on

- 34 -

all of the elements of the offense charged.  (*People v. McDaniel* (1979) 24 Cal.3d 661, 670.)  As this court has held, the determinative element of second degree felony murder is whether the defendant's criminal act had a purpose which was collateral to the act of injuring the victim.  (*People v. Randle, supra,* 35 Cal.4th 987, 1005.)  Since this principle was fundamental to the jury's understanding of the issue before it, the trial court erred by failing to give an appropriate instruction.

As the U.S. Supreme Court has recently clarified, whenever a defendant's exposure to greater punishment or liability depends on factual findings concerning the circumstances of the offense, those factual matters must be submitted to the jury for its consideration.  (*Apprendi v. New Jersey* (2000) 530 U.S. 466, 484-485.)  In the context of second degree felony murder, this court has decreed that liability may only be found when the defendant's criminal act had a purpose collateral to that of injuring the victim. Plainly, this is a question of fact on which the jury must pass.  (*Ibid.*)

Should there be any doubt concerning this conclusion, one need only look to the disparate results in *Robertson* and *Randle*.  In each case, the court closely analyzed the facts in order to render a determination as to whether the defendant had an intent collateral to shooting the victim. (*Randle*, supra, 35 Cal.4th 987, 1005, emphasis added ["[t]he *fact* that defendant admitted

shooting at Robinson distinguishes *Robertson* and supports application of the merger rule here."]; *Robertson*, supra, 34 Cal.4th 156, 173, emphasis added ["[w]e conclude that the merger doctrine does not preclude application of the felony-murder rule *under the facts of the present case* . . . ."].)  Given the court's emphasis on the fact-based analysis which supported its holdings, the conclusion necessarily follows that petitioner had a federal constitutional right to have the jury adjudicate the issue of whether the collateral purpose rule was applicable in this case.  (*Apprendi v. New Jersey*, supra, 530 U.S. 466, 484-485.)

The remaining question is whether the error was prejudicial.  Insofar as the error implicates the due process clause of the federal Constitution, the burden falls on the government to establish that the error was harmless beyond a reasonable doubt.  (*People v. Sakarias* (2000) 22 Cal.4th 596, 624-625 [failure to instruct on all of the elements of felony murder compels application of the prejudice standard found in *Chapman v. California*, supra, 386 U.S. 18, 24].)  On the instant record, the government cannot possibly satisfy the *Chapman* test.

The evidence overwhelmingly established that petitioner shot directly at the door behind which Mr. Hernandez was sitting.  On this record, it is inconceivable that a correctly instructed jury would have found that petitioner

had a purpose which was collateral to assaulting Mr. Hernandez. (*People v. Chun*, supra, 2007 Cal.App. Lexis 1537, p. 33 of slip opinion ["the reasonable inference is that one who shoots another at close range intends to harm, if not to kill. [Citations]."].)  Moreover, even if the evidence was more closely balanced, reversal would nonetheless be required.

In *Neder v. United States* (1999) 527 U.S. 1, the Supreme Court considered the situation where the trial court erred by failing to instruct on an element of the offense.  The court indicated that this type of error cannot be deemed harmless if the element in question was subject to dispute.

> "Of course, safeguarding the jury guarantee will often require that a reviewing court conduct a thorough examination of the record.  If, at the end of that examination, the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error-*for example where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding*-it should not find the error harmless." (Id. at p. 19, emphasis added.)

Petitioner will not belabor the obvious.  At trial, the jury heard ample evidence that petitioner lacked a collateral purpose in shooting Mr. Hernandez. Insofar as the jury heard "evidence sufficient" to support a finding in petitioner's favor, the error must be deemed prejudicial. (*Neder,* supra, 527 U.S. 1, 19.)

## II.

## IF THIS COURT SHOULD HOLD THAT THE

COLLATERAL PURPOSE RULE DOES NOT APPLY TO THE OFFENSE OF SHOOTING AT AN OCCUPIED VEHICLE, REVERSAL IS REQUIRED UNDER THE EQUAL PROTECTION CLAUSES OF THE STATE AND FEDERAL CONSTITUTIONS.

As was discussed above, the case law is in conflict as to whether the collateral purpose rule applies in all, or only some, cases. On the one hand, this court has held that the rule does not apply to the offense of shooting at an inhabited dwelling. (*People v. Hansen*, supra, 9 Cal.4th 300, 315.) On the other hand, the rule has been applied to the crime of negligently discharging a firearm. (*People v. Robertson*, supra, 34 Cal.4th 156, 171.) Assuming that *Robertson* did not implicitly overrule *Hansen*, the present state of the law leads to a classic violation of equal protection.

A conceivable reading of *People v. Robertson*, supra, 34 Cal.4th 156 is that there are now two classes of defendants charged with second degree felony murder. The two classes are those who commit a felony which allows for the application of the collateral purpose rule (e.g. discharge of a firearm with gross negligence) (*Randle*, supra, 35 Cal.4th 987) and those who commit a felony where the collateral purpose rule does not apply (e.g. shooting at an occupied vehicle). (*People v. Tabios*, supra, 67 Cal.App.4th 1.) Insofar as there is no logical basis for the disparate treatment of these two classes, petitioner must be afforded a remedy.

- 38 -

"'The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner.' [Citations.]" (*People v. Hofsheier* (2006) 37 Cal.4th 1185, 1199, emphasis in original.)  In measuring this requirement, a court must ask whether the classes in question are similarly situated with respect to the purpose of the law challenged.  (*Id*. at pp. 1199-1200.)

The purpose of the second degree felony murder rule is to deter "both carelessness in the commission of a crime and the commission of the inherently dangerous crime itself. [Citations.]" (*People v. Robertson*, supra 34 Cal.4th 156, 171.)  Given this purpose, it is manifest that petitioner is similarly situated to those defendants who enjoy the benefit of the collateral purpose rule.

Under the second degree felony murder rule, the danger posed by a felony is viewed in the abstract.  (*Robertson*, supra, 34 Cal.4th 156, 166.)  Concededly, the act of shooting at an occupied vehicle is dangerous since people are present in the car.  However, it is equally true that the act of discharging a firearm with gross negligence poses an enormous risk of injury or death.  Indeed, a violation of section 246.3 requires a showing that a firearm was discharged in such a grossly negligent manner that injury or death might

occur.  (*Robertson*, supra, 34 Cal.4th 156, 169.)  Since a violation of section 246.3 poses no less danger than the act of shooting at an occupied car, it is manifest that petitioner is similarly situated to a defendant who has violated section 246.3.

The remaining question is whether there is any rational basis for the disparate classes created by the case law.  (*Hofsheier*, supra, 37 Cal.4th 1185, 1200-1201.)  An extended analysis on this point is not required.

At the outset, it must again be noted that the dangerousness of a felony is to be examined in the abstract.  (*Robertson*, supra, 34 Cal.4th 156, 166.) Employing this perspective, there is quite simply no rational explanation for excluding petitioner from the application of the collateral purpose rule.

The dispositive point is that the offense of shooting at an occupied vehicle is no more dangerous in the abstract than the crime of discharging a firearm with gross negligence.  As this court has noted, a violation of section 246.3 "'presupposes that there are people in harm's way' [citation]. . . ." (*Robertson*, supra, 34 Cal.4th 156, 169.) Thus, it quite simply makes no sense to conclude that a person committing one dangerous crime is allowed the benefit of the collateral purpose rule whereas a person committing a similar dangerous crime has no resort to the rule.  This absurd state of affairs cannot be tolerated under the equal protection clause. (*Hofsheir*, supra, 37 Cal.4th

1185, 1200-1207 [equal protection violated by statute which required mandatory sex registration for the commission of unlawful oral copulation but not unlawful sexual intercourse]; *Skinner v. Oklahoma Ex. Rel. Williamson* (1942) 316 U.S. 535, 542 [equal protection violation found where state scheme allowed for sterilization of defendants who sustained multiple larceny convictions but not those who suffered multiple embezzlement convictions].)

Having established an equal protection violation, it follows that reversal is required.  As was discussed above, the People cannot demonstrate beyond a reasonable doubt that a conviction would have been returned had the jury been instructed on the collateral purpose rule.  (Pages 34-37, supra.)  The murder conviction must be reversed.

III.

PETITIONER WAS DEPRIVED OF DUE PROCESS UNDER THE FOURTEENTH AMENDMENT TO THE FEDERAL CONSTITUTION WHEN HIS APPELLATE ATTORNEY FAILED TO ADVANCE HIS EQUAL PROTECTION CLAIM ON APPEAL.

A criminal defendant has a federal due process right to the effective assistance of appellate counsel. (*Evitts v. Lucey* (1985) 469 U.S. 387, 396-397.)  In order to establish a due process violation, a defendant must show that: (1) counsel's performance fell below an objective standard of reasonableness; and (2) there is a reasonable probability that the result of the

appeal would have been different absent counsel's error. (*Cockett v. Ray* (9th Cir. 2003) 333 F.3d 938, 944.)  In this case, petitioner can amply make the required showing.

With regard to prong one of the test, appellate counsel has provided a declaration.  (Exhibit C.)  Counsel has candidly admitted that he simply failed to consider the equal protection issue.  Counsel believes that the issue is meritorious and has expressly conceded that he erred by failing to raise it. Thus, there is no doubt that counsel's performance fell below the required standard.

With respect to the issue of prejudice, petitioner will not repeat his analysis regarding the merits of the equal protection claim.  (Pages 38-41, supra.)  It is sufficient to note that the contention is meritorious.  Thus, if appellate counsel had raised the issue, petitioner's murder conviction would have been reversed.  As a result, this court should now grant relief.

///

///

///

///

///

IV.

- 42 -

AS AN ALTERNATIVE TO THE FOREGOING ARGUMENTS, THIS COURT SHOULD ABROGATE THE SECOND DEGREE FELONY MURDER RULE SINCE IT IS UNCONSTITUTIONAL UNDER BOTH THE STATE AND FEDERAL CONSTITUTIONS.

The second degree felony murder rule suffers from two severe constitutional defects. For the reasons which follow, the rule should be abrogated.

A.   The Second Degree Felony Murder Rule Is Unconstitutional Since It Was Created By The Courts Rather Than The Legislature.

Pursuant to Article III, section 3 of the California Constitution, the judicial branch of government is barred from exercising legislative power. Thus, the power to define crimes is vested exclusively in the legislative branch. (*Manduley v. Superior Court* (2002) 27 Cal.4th 537, 552.) This principle is also enshrined in the Penal Code which specifically provides that no act performed in California is criminal unless it is specified in statutory law. (Penal Code section 6.) As will now be explained, the second degree felony murder rule must be struck down since it is violative of these principles.

The Legislature has defined murder as an unlawful killing committed with malice aforethought. (Penal Code section 187, subd. (a).) The sole exception to this requirement is that malice need not be proved in the case of

- 43 -

*first* degree felony murder. (Penal Code section 189.) Thus, under the explicit terms of the Penal Code, malice is a required element for the crime of second degree murder.

As this court has admitted, "the second degree felony-murder rule is a court-made rule [which] has no statutory definition." (*People v. Howard* (2005) 34 Cal.4th 1129, 1135.) Indeed, there is no getting around this fact since the court has also conceded that the doctrine has eliminated the required statutory element of malice. (*People v. Robertson,* supra, 34 Cal.4th 156, 165.) Given the court's statements, the conclusion is inescapable that the second degree felony murder rule must be abrogated.

Under Article III, section 3, a court may not create a crime. Since the Legislature has not authorized the use of the second degree felony murder rule, the judgment must be reversed.

B.    If It Is Held That The Element Of Malice Is Presumed By The Commission Of A Qualifying Felony, The Judgment Must Be Reversed Since The Use Of An Irrebutable Presumption Is Proscribed By The Due Process Clause Of The Federal Constitution.

Prior to *People v. Robertson,* supra, 35 Cal.4th 156, this court repeatedly indicated that the element of malice was presumed when the commission of a qualifying felony was shown. (*People v. Hansen,* supra, 9 Cal.4th 300, 308; *People v. Satchell* (1971) 6 Cal.3d 28, 34, 43 and fn. 11.)

- 44 -

Assuming that the court did not intend to overrule these authorities in *People v. Robertson,* supra, 34 Cal.4th 156, the federal Constitution precludes application of the second degree felony murder rule.

By statute, malice is an element of second degree murder. (Penal Code section 187, subd. (a).) Thus, it is incumbent upon the prosecutor to prove the element. If, this court has indicated, the element is presumed from the commission of the underlying felony, federal constitutional error must be found.

As a matter of due process, the court may not instruct the jury that it must conclusively presume that an element of the offense has been proven. (*Carella v. California* (1989) 491 U.S. 263, 265-266.) Since the second degree felony murder instructions in this case did not require the jury to consider the element of malice, the jury was effectively told to conclusively presume that malice was proven. As a result, the element of malice was unconstitutionally removed from the jury's consideration.

When the jury has been instructed on a mandatory presumption, reversal is compelled unless the record establishes beyond a reasonable doubt that "the jury actually rested its verdict on evidence establishing the presumed fact beyond a reasonable doubt, independently of the presumption." (*Yates v. Evatt* (1991) 500 U.S. 391, 404.) Here, it is impossible for the government to

- 45 -

satisfy this test.

The jury returned a general verdict which gave no clue as to whether appellant was convicted on a malice murder theory or a felony murder theory. Since we have no way of knowing whether the jury gave *any* consideration to the element of malice, the judgment must be reversed. (*Yates*, supra, 500 U.S. 391, 404.)

V.

ALTHOUGH PETITIONER HAS PREVIOUSLY TAKEN AN APPEAL AND A HABEAS PETITION, THE ISSUES RAISED IN THIS PETITION ARE PROPERLY BEFORE THE COURT.

Petitioner is well aware of the general procedural rules that: (1) habeas may not serve as a second appeal; and (2) successive habeas petitions are disfavored. (*In re Harris* (1993) 5 Cal.4th 813, 825; *In re Clark* (1993) 5 Cal.4th 750, 767-768.) However, the general rules have no application here.

It is true that Issues 1 and 4 were raised and rejected on petitioner's appeal. However, an issue previously decided on appeal may be raised on habeas when the issue involves a constitutional error which is both "clear and fundamental" and "strikes at the heart of the trial process . . . ." (*Harris*, supra, 5 Cal.4th at p. 834.) Here, the errors in question involve an unconstitutional theory of second degree murder liability. Insofar as the effect of the errors is to condemn petitioner to serve an unlawful sentence of 15 years to life, it is

- 46 -

manifest that this court would act properly by granting relief.

Issue II is also properly before the court even though it could have been raised on petitioner's prior appeal. Plainly, a blatant violation of equal protection is the type of "fundamental" constitutional error which strikes at the fairness of our judicial process. (*Harris*, supra, 5 Cal.4th 813, 834.) Thus, the issue is cognizable in this proceeding.

Finally, the claim of ineffective assistance of appellate counsel raised in Issue III is also cognizable even though petitioner has filed a previous habeas petition. In the prior petition, a claim of ineffective assistance of trial counsel was raised. (Exhibit A.) Insofar as appellate counsel has admitted that he erred by failing to raise the equal protection issue on appeal, it is entirely proper for the claim of ineffective assistance of counsel to now be considered. (*Clark*, supra, 5 Cal.4th 750, 780 [a successive habeas petition will be allowed when the defendant's "counsel failed to afford adequate representation in a prior habeas corpus application . . . ."].)

Moreover, the underlying equal protection claim raises a fundamental question relating to the fairness of petitioner's trial. For this reason as well, the instant petition should be entertained on its merits. (*Clark*, supra, 5 Cal.4th at p. 797, fn. omitted [a successive petition will be granted when the defendant can show that constitutional error "led to a trial that was so

fundamentally unfair that absent the error no reasonable judge or jury would have convicted the petitioner . . . ."].)

Petitioner will not belabor his cause. The conviction for second degree murder is fatally tainted by fundamental constitutional error. The interests of justice demand that the conviction be reversed.

<u>CONCLUSION</u>

For the reasons expressed above, the conviction for second degree murder should be reversed.

Dated: September ____, 2007                    Respectfully submitted,


_____
DALLAS SACHER
Attorney for Petitioner,
David Leon

- 48 -

## <u>CERTIFICATE OF COUNSEL</u>

I certify that this petition contains 9912 words.

Dated: September _____, 2007

_____
DALLAS SACHER
Attorney for Petitioner,
David Leon

## PROOF OF SERVICE

I declare that I am over the age of 18, not a party to this action and my business address is 100 N. Winchester Blvd., Suite 310, Santa Clara, California 95050.  On the date shown below, I served the within *PETITION FOR WRIT OF HABEAS CORPUS AND BRIEF IN SUPPORT THERE OF* to the following parties hereinafter named by:

 X   Placing a true copy thereof, enclosed in a sealed envelope with postage thereon fully prepaid, in the United States mail at Santa Clara, California, addressed as follows:

John Deist, Esq.
Office of the Attorney General
455 Golden Gate Avenue
Suite 11,000
San Francisco, CA 94102-7004
[attorney for respondent]

David Leon
V-72125
High Desert State Prison
P.O. Box 3030
Susanville, CA 96127

I declare under penalty of perjury the foregoing is true and correct.  Executed this ____ day of September, 2007, at Santa Clara, California.

_____
Priscilla A. O'Harra

- 50 -