# EXHIBIT A

Filed 10/20/06  P. v. Leon CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b). This opinion has not been certified for publication or ordered published for purposes of rule 977.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H028370 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. EE223464) |
| v. | |
| DAVID LEON, | |
| Defendant and Appellant. | |

Defendant David Vincent Leon was convicted after jury trial of second degree murder (Pen. Code, § 187),[1] and discharging a firearm at an occupied motor vehicle (§ 246). The jury also found true allegations that defendant personally and intentionally discharged a firearm during the commission of the offenses. (§ 12022.53, subd. (d).) After denying defendant's motion to reduce the conviction to manslaughter, the court sentenced defendant to the indeterminate term of 40 years to life.

On appeal defendant contends that (1) he was deprived of due process when the court refused to instruct the jury with CALJIC No. 5.43; (2) he was deprived of due process when the court instructed the jury with CALJIC Nos. 5.54 and 5.55; (3) he was deprived of due process when the court refused to instruct the jury that a pellet gun is a dangerous and deadly weapon; (4) the court erred by failing to instruct the jury sua

---

[1] All further statutory references are to the Penal Code.

sponte that a citizen may use deadly force in order to apprehend a fleeing burglar; (5) the judgment must be reversed due to cumulative prejudice resulting from the above errors; (6) he was deprived of due process when the court failed to instruct the jury sua sponte that a citizen may justifiably kill a burglar when the nature of the crime is such that it yields a reasonable fear of death or great bodily harm;[2] (7) the murder conviction must be reversed due to the court's error in instructing the jury on the principles of felony murder; and (8) the court erred by failing to grant his motion under *People v. Dillon* (1983) 34 Cal.3d 441 (*Dillon*). As we reject all of defendant's contentions, we affirm the conviction.

Defendant has also filed a petition for writ of habeas corpus contending that he was deprived of the effective assistance of counsel, which the court ordered considered with the appeal. We have disposed of the petition by separate order filed this date. (See Cal. Rules of Court, rule 24(b)(4).)

## BACKGROUND

Defendant was charged by information filed December 26, 2003, with the murder of Enrique Hernandez (§ 187, count 1), discharging a firearm at an occupied motor vehicle (§ 246, count 2), and assault with a firearm (§ 245, subd. (a)(2); count 3). The information further alleged that defendant personally and intentionally discharged a firearm during the commission of the offenses in counts 1 and 2 (§ 12022.53, subd. (d)), that he personally used a firearm during the commission of the offense in count 3 (§ 12022.5, subd. (a)(1)), and that he committed all the offenses for the benefit if a criminal street gang (§ 186.22, subd. (b)). On May 28, 2004, the trial court granted defendant's motion to dismiss count 3 pursuant to section 995.

---

[2] Appellant raised this contention in a supplemental opening brief.

2

***The prosecution's case***

Eighteen-year-old Hernandez was a member of the Sureno SST gang. Sometime around midnight on November 15, 2002, Kimiko Rodriguez and Hernandez, her boyfriend, were driving by a market on Fair Oaks in Sunnyvale in her green Honda Civic when Hernandez yelled "hey, what's up" to defendant, who was walking outside the market. Hernandez, who had been drinking, jumped out of the car and ran up to defendant, yelling. A fist fight ensued. Defendant fell down, got up, and ran away. Hernandez ran after him, whistling for some nearby fellow gang members to join him, and Rodriguez followed in her car. Defendant, his brother, and his neighbor Jesse Bynum, who had joined defendant, disappeared near a house on America Avenue. Hernandez ran to where defendant and the others disappeared, and called out for them to come back and fight. Four Sureno gang-member friends joined Hernandez on the street. After Hernandez told his friends what happened, he returned to Rodriguez's car. Rodriguez drove Hernandez to his friend's apartment complex on Fair Oaks, where Hernandez promised to stay, and then she drove home.

Defendant and his brother ran inside his parents' home on America Avenue. Defendant got a handgun. Defendant and his brother then returned to the street and Bynum, who had gone inside his own home, rejoined them. The other men had left, but soon returned. They came toward defendant, yelling gang slogans. Defendant fired a shot into the air and he, his brother and Bynum ran after the other men. The other men scattered and defendant, his brother, and Bynum returned to defendant's parents' kitchen.

Officers came to the neighborhood around 1:00 a.m. due to a report by a neighbor of hearing a gunshot. Officers both drove and walked up and down America Avenue.[3] They left after about 15 minutes without seeing anybody on the street.

---

[3] America Avenue is only one block long.

3

Around 2:00 a.m. on November 16, 2002, Rodriguez got a message on her cell phone from Hernandez, asking her to pick him up. She returned the call and the man who answered the phone told her that Hernandez was upset about something regarding Nortenos and a truck. Rodriguez drove back to Hernandez's friend's apartment complex and found Hernandez outside, smoking. He got into her car and told her that, after they had driven away from the house on America Avenue, shots were fired at his friend Jose Alcazar.[4] Hernandez was upset and told her that he wanted to go home with her. En route, Hernandez told Rodriguez that he wanted her to drive by some place real quickly. He directed her to back to America Avenue and told her to stop in front of one of the houses. She passed the house he indicated and made a U-turn. She turned off her headlights and drove slowly down the street and stopped where he told her to, next to Bynum's pickup truck. Hernandez got out of the car, leaving the door open, and started punching the window of the truck while yelling that people could not mess with his friends. It was around 2:30 a.m., and a porch light went on in a nearby house, so Rodriguez told Hernandez to get back in her car.

Defendant, Bynum and another neighbor were outside that neighbor's house down the street, talking behind some bushes at the fence line. Rodriquez saw some movement in those bushes and then saw defendant come around the bushes and jog down the middle of the street toward her car with his hands in his sweatshirt pockets. When Hernandez saw defendant, he jumped back into the Civic and said "go, babe, go." Rodriguez turned on her headlights, put the car in gear, and stepped on the gas. Because it looked as though she might hit defendant, she took her foot off the gas and the car slowed. Defendant changed directions and came along the passenger side of Rodriguez's car. When defendant was outside the passenger window, about three feet from it, there was a

---

[4] Alcazar's testimony from the preliminary hearing regarding the incident was read to the jury.

4

loud bang. Rodriguez looked back and saw defendant continue down the street and run across a lawn as she was driving away. Defendant ran into his parents' house.

Hernandez yelled, "I got shot." He pulled up his shirt and showed Rodriguez that he was bleeding from a hole in his chest. A bullet had entered above his right chest and exited on the left side of his body. He started gasping for air. Rodriguez drove back to Hernandez's friend's apartment complex and yelled for help. Two of defendant's friends got into the car and went with them to the hospital. Hernandez died at the hospital later that morning. At the hospital, an officer recovered approximately 75 BBs from Hernandez's shirt pocket.

Later in the morning of November 16, 2002, investigating officers found a bullet hole in the front passenger side door of Rodriguez's Civic, just below the window. The hole went all the way through the door at a rearward and downward angle. Inside the car officers found a bullet on the floorboard between the front passenger seat and the door, a BB/pellet gun in the front passenger floorboard area, and blood stains. Officers found casings for a nine-millimeter pistol in the street just north and south of defendant's parents' house. Under the couch in the living room of the house officers found a loaded Star nine-millimeter pistol covered with a washcloth and latex gloves. A criminalist with the Santa Clara County Crime Laboratory[5] determined that the casings found in the street were fired by the nine-millimeter pistol found inside defendant's parents' home. The criminalist was not able to determine conclusively whether the same gun fired the bullet found inside the Civic.

Detective Craig Anderson interviewed defendant around midday on November 16, 2002. The interview was tape recorded and the tape, People's exhibit No. 15, was played for the jury. The tape reveals that during the interview defendant said that he was walking by the market after midnight when a Mexican male who had been driving by

---

[5] All criminalists referenced are from the Santa Clara County Crime Laboratory.

came after him and started a fight. He did not want to fight so he ran home, and the man
and others ran after him. He went inside, locked the door, and went to sleep. The
detective told defendant that he was not being truthful about what happened after he
arrived home. Defendant then said that he got a gun, went back outside, and shot it once
into the air when he saw between six and eight men coming his way. The men scattered.
Defendant's neighbors came out when they heard the shot. Defendant told them what
happened and then went back inside and fell asleep on the couch. The detective again
told defendant that he was not being truthful. Defendant then said that after the police
came and went, a truck full of men drove up and down the street. Defendant and his
friends hid in some bushes. Then the Civic that drove by when he was originally
attacked drove by him with its lights off. A man jumped out of the car and started hitting
Bynum's truck with what sounded like BBs, although defendant did not see a gun.
Defendant ran after the man. When the man saw defendant, he hopped back into the
Civic without pointing anything at defendant, and the car sped off. The car swerved a
little, but defendant did not think that the driver was trying to hit him. Defendant shot at
the bottom half of the door of the Civic as it passed him; he was not trying to hit
Hernandez. He then threw the gun into some bushes and ran back inside his house.

  Defendant was arrested at the conclusion of his interview. A criminalist
determined that particles commonly associated with gunshot residue were detected on
samples taken from the hands of both defendant and Hernandez. Around 2:00 p.m. on
November 16, 2002, Officer Kathryn Debeaubien transported Omar Guzman, who is a
registered Norteno gang member, and defendant from the Sunnyvale booking facility to
the San Jose main jail. At the beginning of the trip, defendant and Guzman said that they
did not know each other. During the trip defendant told Guzman, " 'Yeah, I guess I
killed him,' " referring to Hernandez. Defendant then briefly described for Guzman what
had occurred. Defendant said that he wished there could be frequent patrols in the area.

6

Sunnyvale Police Lieutenant Timothy Ahearn testified as an expert on criminal street gangs that, in his opinion, defendant is a member of a Norteno criminal street gang, and that the shooting of Hernandez was done for the benefit of the gang. Defendant had previously been found with Norteno gang members, his oldest brother was an admitted member of a Norteno gang, and defendant had Norteno gang-related tattoos. On November 16, 2002, defendant was renting a room in a house on America Avenue[6] where another resident was a Norteno gang member and defendant had a Life magazine with " 'Mobsters and Gangsters' " on its cover displayed in his room. Witnesses heard gang slogans being yelled out between the two groups of men before the shooting occurred, defendant used derogatory terms for Sureno gang members when referring to the men who he felt were harassing him, and there had been a lot of gang activity in the neighborhood in the previous two years.

### The defense case

Alma Gonzalez saw Hernandez get out of Rodriguez's car and start fighting with two men who had come out of a different car outside the market on the night of November 15, 2002. Later, after she and others were at the apartment complex on Fair Oaks, Hernandez said that the guy he had chased on America Avenue had fired a shot at Alcazar, so that they should all be careful.

On the night of November 16, 2002, Cheuritta Cox, who lived next door to the Leon family, heard her dog barking and people yelling outside. She looked out her kitchen window and saw a circle of people in front of her house and a black car with a girl standing on its open-door frame. Cox assumed that it was a fight over a girl. She saw a flash from a gun and heard a gunshot come from defendant. She called the police. The car left but there were still people outside when she checked later.

---

[6] Defendant and his girlfriend were living in a friend's house down the street from his parents' house.

7

Criminalists tested a blood sample taken during Hernandez's autopsy. They determined that he had a blood alcohol level of .09, and that he also tested positive for methamphetamine and amphetamine.

David Medina used to live around the corner from defendant's parents' America Avenue house, but he did not know defendant. He went to school with Hernandez, who was an SST gang member. When Medina was in school, he was affiliated with a Norteno gang. He is no longer affiliated with that gang even though he still has gang tattoos. To his knowledge, defendant was not a member of his gang, nor was anybody else who lived on America Avenue. Once, during their freshman year, Hernandez was with at least 10 SST gang members when he attacked Medina in the student parking lot.

Omar Guzman went to school with Medina and Hernandez. He had never seen defendant before they were both transported to jail in the same patrol car after his arrest on November 16, 2002. Guzman told defendant that he was Cesar's younger brother after defendant told Guzman that he looked like Cesar. Defendant asked Guzman why he was going to jail. After Guzman told him that it was for assault with a deadly weapon, Guzman asked defendant why he was going to jail. Defendant said that it was for murder. He said that he was walking home from a bar when he was approached by three people who asked if he was a gang member. They kept harassing him, so when he went home he grabbed a pistol and went outside. He saw a truck with its lights off approach his house and somebody inside point a gun at his house. He heard a clicking noise and then fired two shots at the truck. He said that he told the police what happened. Defendant told the transporting officer that he was afraid that there would be some retaliation against his family and asked her to have other officers patrol the area. Guzman admitted that he was convicted for a felony assault on Alcazar for the benefit of a criminal street gang.

Travis Cox[7] grew up on America Avenue with defendant. He considers defendant to be honest and very respectful. Defendant never associated with gangs. Ryan Light[8] went to high school with defendant and they worked together. He considers defendant to be honest and does not consider him to be a violent person. Defendant was not involved in any gang activity that occurred at their high school. Derrick Stahmer grew up with defendant on America Avenue. He gave defendant all of his tatoos. Defendant's brother drew the peacock tattoo for him, and Stahmer has given the smile-now-cry-later tattoo and the Virgin Mary tattoo to many other people. Judy Stahmer, Derrick's mother, considers defendant to be very honest and not violent. She never heard of defendant being involved in gang activity during high school. Todd Rudy's grandmother lived on America Avenue for 45 years and he has lived there for six years. He has never seen defendant be violent in any manner. He has never had any problems with the occupants of the apartment complex on Fair Oaks. Stanley Stovall has known defendant's family most of his life and he worked with defendant and one of his brothers. To his knowledge no one in the Leon family has ever been involved with gangs. He considers defendant to be non-violent and honest.

### *Rebuttal*

Officer Debeaubien testified that, while she was transporting defendant and Guzman, she did not hear defendant say anything about the person he shot chasing him in a truck and pointing a gun. She did not hear defendant say anything about hearing two clicking sounds before firing his own gun. She did not hear defendant say anything about knowing that the person he shot had a gun.

---

[7] Travis Cox is Cheuritta Cox's brother.

[8] Light testified on cross-examination that he has a 1999 felony conviction for possession of methamphetamine for sale.

9

*Verdicts, Dillon motion, and sentencing*

On October 14, 2004, the jury found defendant not guilty of first degree murder but guilty of second degree murder (§ 187) and of discharging a firearm at an occupied motor vehicle (§ 246). The jury found true the allegations that defendant intentionally and personally discharged a firearm (§ 12022.53, subd. (d)) during the commission of both offenses, but not true the allegations that the offenses were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(4)). On October 26, 2004, defendant filed a motion under *Dillon, supra*, requesting that the court reduce his conviction from second degree murder to manslaughter (§ 192, subd. (a)), and the gun use enhancements under section 12022.53, subdivision (d) to enhancements under section 12022.5, subdivision (a), so that the court could sentence defendant to a determinate term of between six and 21 years in prison. The prosecutor filed opposition to defendant's motion on November 24, 2004. The court held a hearing on the motion on December 20, 2004. On January 18, 2005, the court denied the motion and sentenced defendant to an indeterminate term of 15 years to life on the murder count, with a consecutive term of 25 years to life for the firearm use enhancement and a concurrent term of five years plus 25 years to life on the discharging-a-firearm count.

## DISCUSSION

*CALJIC No. 5.43*

After the court instructed the jury, but before closing arguments, the court allowed the parties to place on the record arguments relating to any instructions it refused to give. The court stated that after much discussion it refused to give CALJIC Nos. 5.40 [defense

10

of property—ejection of trespasser],[9] 5.42 [resisting an intruder upon one's property][10] and 5.43 [force that may be used in defense of property],[11] as well as a special instruction requested by the prosecutor based on *People v. Ceballos* (1974) 12 Cal.3d 470. Defendant stated that he had suggested modification of CALIC No. 5.42 to refer to an entry or an attack on a residence. He argued that the modified instructions should have been given because a legitimate inference from the evidence presented was that defendant was trying to protect himself, his family members, and the family home from a drive-by shooting. The prosecutor argued that the instructions were not relevant to the facts in this case because the instructions mainly relate to an intruder breaking into a house and the

---

[9] CALJIC No. 5.40 states: "The lawful [owner] [occupant[s]] of [a [residence] [habitation] on] real property [has] [have] the right to request a trespasser to leave the premises. If the trespasser does not do so within a reasonable time, the [owner] [occupant[s]] may use reasonable force to eject the trespasser. [¶] The amount of force which may be used to eject the trespasser is limited by what would appear to a reasonable person, under the existing circumstances, to be necessary to prevent [damage to the property] [or] [physical injury [or] death] to the [owner] [occupant[s]] [and (family members, guests, etc.)]."

[10] CALJIC No. 5.42 states: "A person may defend [his] [her] home or dwelling against anyone who manifestly intends or endeavors in a violent or riotous manner, to enter that home or dwelling and who appears to intend violence to any person in that home or dwelling. The amount of force which the person may use in resisting the trespass is limited by what would appear to a reasonable person, in the same or similar circumstances, necessary to resist the violent or unlawful entry. [He] [She] is not bound to retreat even though a retreat might safely be made. [He] [She] may resist force with force, increasing it in proportion to the intruder's persistence and violence if the circumstances which are apparent to the [homeowner] [lawful occupant] of the property are such as would excite similar fears and a similar belief in a reasonable person."

[11] CALJIC No. 5.43 states: "When conditions are present which, under the law, justify a person in using force in defense of property, that person may use that degree and extent of force as would appear to a reasonable person, placed in the same position, and seeing and knowing what the resisting person then sees and knows, to be reasonably necessary to prevent imminent injury threatened to the property. Any use of force beyond that limit is excessive and unjustified, and anyone using excessive force is legally responsible for the consequences thereof."

11

force that can be used to repel that intruder. However, if the instructions were given, because Hernandez was simply attempting to inflict some vandalism on Bynum's truck at the time defendant went after him, an instruction should also have been given that deadly force cannot be used solely for the protection of property, and that the use of deadly force may be used only to prevent an imminent forcible and atrocious felony. The court responded that it decided not to give the instructions because "I cannot conceive that the jury can find that the defendant was acting to protect the property and not at the same time acting in self-defense or defense of others."

On appeal defendant contends that the court's refusal to give CALJIC No. 5.43 deprived him of due process. He argues that the instruction would have advised the jury that he was entitled to use reasonable force in the defense of property, and that there was ample evidence that he was acting in defense of property when he fired the fatal shot. "Here, [defendant] reasonably believed that Mr. Hernandez was bent on entering Mr. Bynum's vehicle either for the purpose of stealing it or engaging in significant vandalism. Since there was substantial evidence to support such a belief, [CALJIC] No. 5.43 should have been given." We find that the court did not err by refusing to give CALJIC No. 5.43.

The trial court must instruct on general principles of law relevant to the issues raised by the evidence. (*People v Sedeno* (1974) 10 Cal.3d 703, 715, overruled on another ground in *People v. Breverman* (1998) 19 Cal.4th 142, 165.) In addition, the court must give an instruction favorable to a defense supported by substantial evidence if the defendant relies on that defense or if the instruction is not inconsistent with the theory of the defense. (*Id.* at p. 716; *People v. Barton* (1995) 12 Cal.4th 186, 195.) In assessing the evidence to determine whether to give a requested instruction, the trial court should not measure the substantiality of the evidence by weighing the credibility of the witnesses. That duty is within the exclusive province of the jury. However, if the evidence is minimal and insubstantial, then the court need not instruct on its effect.

(*People v. Barnett* (1998) 17 Cal.4th 1044, 1145; *People v. Flannel* (1979) 25 Cal.3d 668, 684.) Finally, we are mindful that any doubt as to the sufficiency of the evidence to support giving an instruction should be resolved in favor of the accused. (*People v. Barnett, supra,* 17 Cal.4th at p. 1145; *People v. Flannel, supra,* 25 Cal.3d at p. 685.) On appeal, our standard of review is whether there was evidence deserving of consideration from which a reasonable jury, accepting all the evidence as true, could find that defendant's actions were justified. (See *People v. Trippet* (1997) 56 Cal.App.4th 1532, 1539.)

Homicide is justifiable when committed by a person defending property when the person threatening the property manifests an intent to commit a forcible and atrocious crime. (§ 197, subd. 2.; *Ceballos, supra,* 12 Cal.3d at p. 478.) Burglary, whether it be of a building or a motor vehicle, may constitute a forcible and atrocious crime under some circumstances. However, "[w]here the character and manner of the burglary do not reasonably create a fear of great bodily harm, there is no cause for exaction of human life (citations), or for the use of deadly force (citation). The character and manner of the burglary could not reasonably create such a fear unless the burglary threatened, or was reasonably believed to threaten, death or serious bodily harm." (*Ceballos, supra,* 12 Cal.3d at p. 479.)

In this case, the asserted attempted burglary by Hernandez of Bynum's truck did not threaten death or serious bodily harm. The evidence at trial was that earlier on the night of the homicide, Hernandez jumped out of a Civic and personally attacked defendant. Defendant ran to his parents' home, retrieved a gun, and shot it into the air when the people he thought were harassing him approached the home. Later, after the police came and went, defendant was outside another home down the street when he saw the same Civic drive by his parents' home again and a man get out and attack Bynum's truck. When defendant ran toward the man, the man got into the Civic and the car sped away. The Civic was passing defendant when he fired the shot into the car door that

13

ultimately killed Hernandez. There was no evidence that anybody was inside or near Bynum's truck at the time Hernandez attacked it, so defendant was not justified in using deadly force merely because Hernandez may have appeared to be attempting to enter the truck in order to steal or vandalize it. In addition, Hernandez had ceased his attack on the truck and was retreating when defendant admittedly fired the shot into the car door. (Compare *Nakashima v. Takase* (1935) 8 Cal.App.2d 35 [owner was inside closed restaurant when he shot dead one of two burglars who forcibly entered it].) Defendant was not justified under section 197 in shooting at Hernandez's retreating vehicle to prevent Hernandez from continuing his attempted burglary or vandalism. (§ 197, subd. 2; *Ceballos, supra*, 12 Cal.3d at pp. 478-479.) And, because defendant was not justified in using deadly force in defense of Bynum's truck, the court did not err in refusing to instruct the jury with CALJIC No. 5.43 as defendant claims.

    The court fully instructed the jury on the principles of justifiable homicide and self-defense with CALJIC Nos. 5.10 [resisting attempt to commit felony], 5.12 [justifiable homicide in self-defense], 5.13 [justifiable homicide—lawful defense of self or another], 5.14 [homicide in defense of another], 5.15 [charge of murder—burden of proof re justification or excuse], 5.16 [forcible and atrocious crime—defined], 5.17 [actual but unreasonable belief in necessity to defend—manslaughter], 5.30 [self-defense against assault], 5.32 [use of force in defense of another], 5.50 [self-defense—assailed person need not retreat], 5.50.1 [prior threats/assaults by victim], 5.51 [self-defense—actual danger not necessary], 5.52 [self-defense—when danger ceases], 5.54.1 [self-defense by an aggressor (formerly 5.54 (7th ed., 2003))], and 5.55 [plea of self-defense may not be contrived]. The court also gave two special instructions: that the prosecution has the burden of proving beyond a reasonable doubt that the elements of self-defense are not present; and that for either perfect or imperfect self-defense, the fear must be of imminent harm rather than of future harm. As the instructions given fully covered the

general principles of law governing the facts of the case, the court's refusal to give

CALJIC No. 5.43 at defendant's request did not deny him due process.

### CALJIC Nos. 5.54 and 5.55

Defendant filed a written objection to several instructions requested by the

prosecution. In it he stated that he "objects to the following CALJIC instructions

requested by the prosecution: [¶] . . . [¶] 5.54 & 5.54.1: Instructions on self-defense by

an aggressor are inapplicable." Defendant did not object to the giving of CALJIC

No. 5.55. As stated above, the court instructed the jury with both CALJIC Nos. 5.54.1

[self-defense by an aggressor (formerly 5.54 (7th ed., 2003))][12] and 5.55 [plea of self-

defense may not be contrived].[13] The court stated that it did not give CALJIC No. 5.54 as

it was withdrawn. For ease of reference and because CALJIC No. 5.54.1 has now been

incorporated into CALJIC No. 5.54, we will refer to the instruction the court gave on

self-defense by an aggressor as CALJIC No. 5.54.

On appeal defendant contends that the giving of CALJIC Nos. 5.54 and 5.55

deprived him of due process. He argues that "there was absolutely no factual basis for

the use of [CALJIC] No. 5.54 in this case," and that CALJIC No. 5.55, although a correct

statement of the law, was improperly given "for the simple reason that [defendant] did

not engage in a 'quarrel' with Mr. Hernandez."

---

[12] The court instructed: "The right of self defense is only available to a person who initiated an assault if he has done all the following. [¶] 1. He has actually tried in good faith to refuse to continue fighting; [¶] 2. He has clearly informed his opponent by either words or conduct that he wants to stop fighting. [¶] And 3. He has clearly informed his opponent by either words or conduct that he has stopped fighting. [¶] After he has done these three things, he has the right to self defense if his opponent continues to fight."

[13] The court instructed: "The right of self-defense is not available to a person who seeks a quarrel with the intent to create a real or apparent necessity of exercising self-defense."

"It is error for a court to give an 'abstract' instruction, i.e., 'one which is correct in law but irrelevant[.]' (Citation.)" (*People v. Rowland* (1992) 4 Cal.4th 238, 282 (*Rowland*).) " '[I]n most cases the giving of an abstract instruction is only a technical error which does not constitute ground for reversal.' (Citation.)" (*Ibid.*) Defendant claims reversal is required in this case because the instructions and the prosecutor's argument based on the instructions "eliminated the defense theory of the case," and the error is analogous to failing to give any instructions on the defense theory. We disagree. Defendant's theory of the case was self-defense and the prosecutor argued that defendant could not claim self-defense because he was the aggressor. It was for the jury to decide the facts of the case and which instructions were applicable, and the jury was so instructed. (See CALJIC No. 1.00.) CALJIC Nos. 5.54 and 5.55 were applicable if the jury found the facts as the prosecutor argued. The instructions were inapplicable if the jury found the facts as defendant argued. The jury was instructed that not all instructions given were necessarily applicable, and that any instruction found inapplicable based on the facts found should be disregarded. (See CALJIC No. 17.31.) And, as we stated above, the court fully and accurately instructed the jury on justification and self-defense. Therefore, there is no reasonable possibility that defendant was prejudiced by the giving of CALJIC Nos. 5.54 and 5.55. (*Rowland, supra,* 4 Cal.4th at p. 282; see also, *People v. Crandell* (1988) 46 Cal.3d 833, 872, criticized on other grounds in *People v. Crayton* (2002) 28 Cal.4th 346, 364-365.)

### *Requested instruction on deadly or dangerous weapon*

Defendant requested that the court give "the following special instruction, defining, in certain circumstances, what constitutes a deadly or dangerous weapon (see, generally, CALJIC [No.] 12.42): [¶] 'A pellet gun, such as the weapon in evidence in this case, constitutes a deadly and dangerous weapon as a matter of law.' [¶] 'As a deadly and dangerous weapon, a pellet gun is capable of inflicting great bodily

injury.' "[14] The court denied defendant's request to give the special instruction. Defendant contends on appeal that the court's refusal to give the instruction denied him due process. Defendant argues that the instruction was a correct statement of the law, that there was substantial evidence that Hernandez was armed with a BB/pellet gun at the time he attacked Bynum's truck, and that the requested instruction provided guidance regarding whether defendant faced an objective risk of imminent harm when he confronted Hernandez.

As we stated earlier, the trial court is charged with instructing upon every theory of the case supported by substantial evidence, including defenses that are not inconsistent with the defendant's theory of the case. (*People v. Sedeno, supra,* 10 Cal.3d at pp. 715-716; *People v. Barton, supra,* 12 Cal.4th at p. 195.) However, if the evidence is minimal and insubstantial, then the court need not instruct on its effect. (*People v. Barnett, supra,* 17 Cal.4th at p. 1145; *People v. Flannel, supra,* 25 Cal.3d at p. 684.) In this case, the only evidence that defendant was aware that Hernandez had a BB/pellet gun when he attacked Bynum's truck was the fact that a BB/pellet gun was found in Rodriquez's car after Hernandez died and defendant's statement to Detective Anderson that he heard what sounded like BBs. However, defendant also told Detective Anderson that he did not see a gun and that Hernandez did not point anything at him before Hernandez jumped back into the car and the car sped away. As there was no substantial evidence that defendant thought he faced an objective risk of imminent harm from a BB/pellet gun, there was no

---

[14] CALJIC No. 12.42 states: "A deadly [or dangerous] weapon is any weapon, instrument or object that is capable of being used to inflict death or great bodily injury[.] [, and it can be inferred from the evidence, including the attendant circumstances, the time, place, destination of the possessor, [the alteration, if any, of the object from its standard form,] and any other relevant facts, that the possessor intended on that [or those] occasion[s] to use it as a weapon should the circumstances require.] [¶] [It is not necessary that a weapon in fact be used or be visible.]"

need to instruct the jury that a BB/pellet gun is a dangerous and deadly weapon.  No denial of due process has been shown.

### *Duty to instruct on the use of deadly force while apprehending a fleeing burglar*

CALJIC No. 5.25 states: "Homicide is justifiable and not unlawful when necessarily committed in attempting by lawful ways and means: [¶] [To apprehend any dangerous person who has committed a felony.  A dangerous person is one who (a) poses a significant threat of death or serious bodily injury to the person attempting the apprehension or to others, or (b) has committed a forcible and atrocious felony.] [¶] [To lawfully suppress any riot.] [¶] [To lawfully keep and preserve the peace.]"  The court did not instruct the jury with CALJIC No. 5.25, and there is no indication in the record that either party requested that it do so.  On appeal defendant contends that the court had a sua sponte duty to give CALJIC No. 5.25, as the use of deadly force is justified while attempting to apprehend a person who has attempted an auto burglary.  We disagree.

As we stated above, a burglary is not a forcible and atrocious felony unless the character and manner of the burglary reasonably creates a fear of great bodily harm.  (*Ceballos, supra*, 12 Cal.3d at p. 479.)  A burglary does not reasonably create a fear of great bodily harm unless the burglary threatens or was reasonably believed to threaten death or serious bodily harm.  (*Ibid*.)  In this case, there was no evidence that anybody was in or around Bynum's truck when Hernandez attacked it.  And, once Hernandez saw defendant, he jumped into the Civic without pointing anything at defendant and the car sped away.  The car was passing defendant when defendant fired the shot that ultimately killed Hernandez.  Accordingly, Hernandez had not posed a significant threat of death or serious bodily harm to defendant, nor had he committed a forcible and atrocious felony, at the time defendant used deadly force.  As there was no substantial evidence supporting the giving of CALJIC No. 5.25, the court did not have a sua sponte duty to give it.

18

### Cumulative error

Defendant contends that the judgment must be reversed due to the cumulative prejudice flowing from the above four alleged instructional errors. As we have rejected all of these claims of instructional error, defendant has suffered no prejudice, cumulative or otherwise.

### Duty to instruct on justifiable homicide while apprehending a fleeing burglar

As stated above, the court instructed the jury with CALJIC Nos. 5.10 [resisting attempt to commit felony], 5.15 [charge of murder—burden of proof re justification or excuse] and 5.16 [forcible and atrocious crime—defined]. The court refused to give CALJIC No. 5.43 [force that may be used in defense of property], because it determined that the jury could not find on the evidence presented that defendant was acting solely in defense of property when he fired the shot that ultimately killed Hernandez. In a supplemental brief, defendant contends that the court had a sua sponte duty to instruct the jury with an instruction fashioned from CALJIC Nos. 5.10, 5.15, 5.16, 14.58 [burglary of motor vehicle—defined] and 6.00 [attempt—defined] and language from *Ceballos, supra*, 12 Cal.3d at page 478, that homicide is justifiable and not unlawful when committed by a person who is resisting an attempt to commit an auto burglary which threatened death or great bodily injury, and that it was the prosecution's burden to prove beyond a reasonable doubt that an attempted auto burglary which threatened death or great bodily injury did not occur. We disagree.

Murder is the unlawful killing of a human being with malice aforethought. (§ 187.) When a killing is proved to have been committed by the defendant, and nothing further is shown, the presumption of law is that it was malicious and an act of murder. (*People v. Craig* (1957) 49 Cal.2d 313, 319.) In those circumstances, the defendant bears the burden of raising the affirmative defense of excuse or justification. (§ 189.5, subd. (a) ["Upon a trial for murder, the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation, or that justify or excuse it,

19

devolves upon the defendant, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable."].) Although the defendant must raise the issue of excuse or justification, the defendant does not bear any burden of proof or persuasion; he or she need only raise a reasonable doubt of his or her guilt. (*People v. Delony* (1953) 41 Cal.2d 832, 841; *People v. Albertson* (1944) 23 Cal.2d 550, 587, disapproved on another point in *People v. Carpenter* (1997) 15 Cal.4th 312, 381-382.) Therefore, when there is some evidence supportive of excuse or justification, or the defendant informs the court that he or she is relying upon such a defense, the jury must be instructed on the defense and the prosecution bears the burden of disproving it beyond a reasonable doubt. (*People v. Frye* (1992) 7 Cal.App.4th 1148, 1158-1159.)

In this case, although there was some evidence supportive of justification based on an attempted auto burglary, there was not substantial evidence supportive of justification based on an attempted auto burglary that threatened death or great bodily injury. And defendant did not inform the court that he was relying upon such a defense. Rather, he told the court that his theory of defense was justification based upon an attempt to protect himself, his family, and the family residence from a possible drive-by shooting. Accordingly, the court was not required to instruct the jury that the homicide was justified or not unlawful if it found that defendant was attempting to resist an attempted auto burglary that threatened death or great bodily injury.

### *Instructions on second degree felony murder*

The court instructed the jury with CALJIC Nos. 8.10 [murder—defined], 8.25 [murder by means of lying in wait], 8.31 [second degree murder—killing resulting from unlawful act dangerous to life], and 8.32 [second degree felony-murder] based on the commission of the charged offense of discharging a firearm at an occupied vehicle (§ 246). The prosecutor argued all three theories to the jury: first degree murder by lying in wait, second degree murder, and second degree felony-murder. The jury found

20

defendant not guilty of first degree murder, but guilty of second degree murder. The record does not disclose on which theory of second degree murder the jury relied, that is, whether it was a killing resulting from an unlawful act dangerous to life or whether it was a murder based on the commission of the offense of discharging a firearm at an occupied vehicle. On appeal, defendant contends that the second degree murder conviction must be reversed because the offense of discharging a firearm at an occupied vehicle merged with the killing, and therefore could not support the second degree murder conviction.

The "merger doctrine" as adopted in *People v. Ireland* (1969) 70 Cal.2d 522 and on which defendant relies, was "a shorthand explanation for the conclusion that the felony-murder rule should not be applied in circumstances where the only underlying (or 'predicate') felony committed by the defendant was *assault*. The name of the doctrine derived from the characterization of the assault as an offense that 'merged' with the resulting homicide. In explaining the basis for the merger doctrine, courts and legal commentators reasoned that, because a homicide generally results from the commission of an assault, every felonious assault ending in death automatically would be elevated to murder in the event a felonious assault could serve as the predicate felony for purposes of the felony-murder doctrine. Consequently, application of the felony-murder rule to felonious assaults would usurp most of the law of homicide, relieve the prosecution in the great majority of homicide cases of the burden of having to prove malice in order to obtain a murder conviction, and thereby frustrate the Legislature's intent to punish certain felonious assaults resulting in death (those committed with malice aforethought, and therefore punishable as murder) more harshly than other felonious assaults that happened to result in death (those committed without malice aforethought, and therefore punishable as manslaughter). [Citations.]" (*People v. Hansen* (1994) 9 Cal.4th 300, 311-312 (*Hansen*).)

In *Ireland*, "the defendant had shot and killed his wife. The jury was instructed that it could return a second degree felony-murder verdict based upon the underlying

felony of assault with a deadly weapon, and the defendant was convicted of second degree murder. [¶] On appeal, [the Supreme Court] reversed, . . . conclud[ing] that the offense of assault with a deadly weapon, which was 'an integral part of' and 'included *in fact*' within the homicide, could not support a second degree felony-murder instruction. [Citation.]" (*Hansen, supra,* 9 Cal.4th at p. 312.)

The court in *Hansen* noted that while the California Supreme Court had applied the merger doctrine in *Ireland* to other felonies involving assault or assault with a deadly weapon, it had "not extended the *Ireland* doctrine beyond the context of assault, even under circumstances in which the underlying felony plausibly could be characterized as 'an integral part of' and 'included in fact within' the resulting homicide." (*Hansen, supra,* 9 Cal.4th at p. 312.) *Hansen* was a case involving the discharge of a firearm at an inhabited dwelling house in violation of section 246, resulting in the death of a girl who was hit in the head by one of the bullets fired by the defendant. The court concluded that "the offense of discharging a firearm at an inhabited dwelling house does not 'merge' with a resulting homicide within the meaning of the *Ireland* doctrine, and therefore that this offense will support a conviction of second degree felony murder." (*Id.* at p. 316.)

In *People v. Tabios* (1998) 67 Cal.App.4th 1, 9-11 (*Tabios*), the appellate court rejected the defendants' contention that shooting into an occupied vehicle in violation of section 246 does not constitute an inherently dangerous felony for purposes of the second degree felony-murder rule. The court noted that a violation of section 246 can be predicated on discharging a firearm at an occupied vehicle as well as on discharging a firearm at an inhabited dwelling house. (*Id.* at p. 9.) "[T]he Supreme Court had no hesitancy [in *Hansen, supra,*] in concluding that a violation of section 246 constitutes an inherently dangerous felony when the violation involves shooting at an inhabited dwelling house. We have no hesitancy in concluding the same result applies with at least equal force when the violation involves firing into an occupied vehicle." (*Tabios, supra,* 67 Cal.App.4th at pp. 10-11.) The appellate court also concluded that the merger

22

doctrine did not apply: "*Hansen* thus controls the present situation.  There was no merger." (*Id.* at p. 11.)

In this case, defendant violated section 246 by discharging a firearm at an occupied motor vehicle rather than at an occupied dwelling house.  However, discharging a firearm at an occupied motor vehicle, like discharging a firearm at an inhabited dwelling house, does not merge with the resulting homicide within the meaning of the *Ireland* doctrine, and will support a conviction of second degree felony murder. (*Tabios, supra*, 67 Cal.App.4th at pp. 9-11.)

*People v. Randle* (2005) 35 Cal.4th 987 (*Randle*) does not compel a contrary finding.  In *Randle*, the defendant admitted in his pretrial statements to the police and to a deputy district attorney that he shot at the homicide victim. (*Id.* at p. 1005.)  The trial court instructed the jury that the defendant could be found guilty of second degree felony murder if the killing was committed in the course of discharging a firearm in a grossly negligent manner in violation of section 246.3, and the jury convicted the defendant of second degree murder. (*Randle, supra*, 35 Cal.4th at p. 993.)  The Supreme Court found that because the defendant admitted shooting at the victim, unlike the defendant in *People v. Robertson* (2005) 34 Cal.4th 156 (*Robertson*), who claimed that he had a collateral purpose in firing his weapon, the facts supported the application of the merger doctrine and reversal of the second degree murder conviction was required. (*Randle, supra*, 35 Cal.4th at pp. 1004-1006.)  " '[U]se of the second degree felony-murder rule was appropriate when the purpose of the predicate felony was independent of or collateral to an intent to cause injury that would result in death.' " (*Id.* at p. 1005.)  "The fact that [Randle] admitted shooting at [the victim, and thus admitted committing an assault,] distinguishes *Robertson* and supports application of the merger rule here." (*Ibid.*)

In *Robertson*, the defendant told police that he fired warning shots when he saw three or four men engaged in either dismantling or stealing his car.  He then fired again while the men were fleeing.  He denied intending that the shots hit the men and claimed

that he fired upwards into the air, intending to scare people away. However, one of the fleeing men died. (*Robertson, supra,* 34 Cal.4th at pp. 161-162.) At trial, the jury was instructed on first degree murder, second degree murder, second degree murder based on commission of the crime of discharging a firearm in a grossly negligent manner, and voluntary manslaughter. The jury convicted the defendant of second degree murder and the defendant appealed, asserting, among other contentions, that the trial court erred in instructing the jury on second degree felony murder. (*Id.* at p. 163.) The Supreme Court concluded that "the merger doctrine does not preclude application of the felony-murder rule under the facts of the present case and that the trial court did not err by instructing the jury concerning the second degree felony-murder rule and the predicate offense of discharging a firearm in a grossly negligent manner." (*Id.* at p. 173.)

In this case, defendant never admitted that he committed an assault by shooting at Hernandez. He claimed that he fired at the bottom half of the door of the Civic and that he did so because he did not want to hit defendant. Therefore, according to defendant's own statements, his shooting at the occupied motor vehicle was undertaken with a purpose collateral to the resulting homicide. Thus, even if we were to find that the collateral purpose rule applies to the offense of discharging a firearm at an occupied vehicle, the merger doctrine would not preclude application of the felony-murder rule in this case.

Defendant contends that the trial court was required to instruct the jury with the collateral purpose rule set out in *Robertson*. He argues that, because the collateral purpose rule exposed him to greater punishment than he would receive under the merger doctrine, whether defendant's shooting at an occupied vehicle had a criminal purpose collateral to that of injuring the victim was a question of fact that must be submitted to the jury for its consideration. (See *Apprendi v. New Jersey* (2000) 530 U.S. 466, 484-485.) We disagree, because we find that the collateral purpose rule does not apply to the offense of discharging a firearm at an occupied vehicle.

24

Only felonies that have been found to be inherently dangerous to human life support application of the second degree felony-murder rule. "In determining whether a felony is inherently dangerous, the court looks to the elements of the felony in the abstract, 'not the "particular" facts of the case,' i.e., not to the defendant's conduct. [Citation.]" (*Hansen, supra*, 9 Cal.4th at p. 309.) The offense of discharging a firearm at an occupied vehicle under section 246 is an inherently dangerous felony that does not merge with the resulting homicide, and thus supports application of the felony-murder rule. (*Tabios, supra*, 67 Cal.App.4th at pp. 10-11) Unlike when the underlying offense is discharging a firearm in a negligent manner, which may or may not constitute an assault depending on the defendant's conduct (see *Robertson, supra*, 34 Cal.4th at p. 173; *Randle, supra*, 35 Cal.4th at p. 1005), application of the merger doctrine did not depend on defendant's conduct in this case, i.e., whether defendant had a collateral purpose in discharging his weapon at the occupied vehicle. Accordingly, the trial court correctly instructed the jury on second degree felony murder based on the inherently dangerous felony of discharging a firearm at an occupied vehicle, and the court was not required to instruct the jury on the collateral purpose rule.

Defendant also contends that the second degree felony-murder rule must be abrogated because it is a court-made rule without a statutory definition. (See *People v. Howard* (2005) 34 Cal.4th 1129, 1135.) We disagree. Section 189 states that specified murders, including those committed in the perpetration of, or attempt to perpetrate, enumerated felonies, is murder of the first degree, and that all other murders are of the second degree. Thus, application of the first degree felony-murder rule is invoked by the perpetration of one of the felonies enumerated in section 189. (*Hansen, supra*, 9 Cal.4th at p. 308.) California Supreme Court cases have long held that the perpetration of a felony, exclusive of those enumerated in section 189, may provide the basis for a second degree murder conviction under the felony-murder rule, if the felony is inherently dangerous to human life. (*People v. Ford* (1964) 60 Cal.2d 772, 795; *People v. Williams*

(1965) 63 Cal.2d 452, 457; *People v. Phillips* (1966) 64 Cal.2d 574, 582, overruled on another point in *People v. Flood* (1998) 18 Cal.4th 470, 490, fn. 12.) The court "explained that the justification for the imputation of implied malice under these circumstances is that, 'when society has declared certain inherently dangerous conduct to be felonious, a defendant should not be allowed to excuse himself by saying he was unaware of the danger to life . . . .' [Citation.]" (*Hansen, supra*, 9 Cal.4th at p. 308.) We are bound by these Supreme Court holdings. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455.) Therefore, we "conclude the statutes do prohibit as second degree murder an unlawful killing committed in the perpetration or attempted perpetration of a nonenumerated felony inherently dangerous to human life." (*People v. Landry* (1989) 212 Cal.App.3d 1428, 1437.)

Defendant lastly contends that the federal Constitution precludes application of the second degree felony-murder rule. He argues that, by statute, malice is an element of second degree murder (§ 187, subd. (a)), so that the prosecutor must prove that element beyond a reasonable doubt. However, the felony-murder rule removes the element of malice from the prosecutor's burden of proof (see *Robertson, supra*, 34 Cal.4th at p. 166), resulting in an unconstitutional mandatory presumption that malice was proven.

In *Dillon, supra*, 34 Cal.3d 441, the defendant contended that malice aforethought is an element of the crime of murder as defined in California (§ 187) so due process requires the prosecution to prove malice beyond a reasonable doubt in every murder prosecution, yet, when the prosecution is conducted on a theory of felony murder, the felony-murder rule relieves the prosecution of this burden of proof because it raises a presumption of malice from the defendant's intent to commit the underlying felony. The defendant relied on *Mullaney v. Wilbur* (1975) 421 U.S. 684 and *Sandstrom v. Montana* (1979) 442 U.S. 510. (*Dillon, supra*, 34 Cal.3d at p. 472.) The Supreme Court rejected the defendant's argument. "We do not question defendant's major premise, i.e., that due process requires proof beyond a reasonable doubt of each element of the crime charged.

26

[Citations.] Defendant's minor premise, however, is flawed by an incorrect view of the substantive law of felony murder in California." (*Id.* at p. 473.)

" 'Killings by the means or on the occasions under discussion [i.e., enumerated in Pen. Code, § 189] are murders of the first degree *because of the substantive statutory definition of the crime. . . .*' [Citations.] The 'substantive statutory definition' of the crime of first degree felony murder in this state does not include either malice or premeditation: 'These elements are eliminated by the felony-murder doctrine, and the only criminal intent required is the specific intent to commit the particular felony.' [Citations.] This is 'a rule of substantive law in California and not merely an evidentiary shortcut to finding malice as it withdraws from the jury the requirement that they find either express malice or . . . implied malice.' In short, 'malice aforethought is not an element of murder under the felony-murder doctrine.' [Citation.] [¶] Because the felony-murder rule thus does not in fact raise a 'presumption' of the existence of an element of the crime, it does not violate the due process clause as construed in *Mullaney* or *Sandstrom*." (*Dillon, supra,* 34 Cal.3d at pp. 475-476, fn. omitted.)

Although the defendant in *Dillon* was convicted of first degree felony murder, the Supreme Court has applied the rule in *Dillon* to second degree felony-murder convictions. For instance, the defendant in *People v. Patterson* (1989) 49 Cal.3d 615, was convicted of second degree felony murder. While discussing the meaning of the term "inherently dangerous to life" for purposes of the second degree felony-murder doctrine, the court stated: "Although the second degree felony-murder doctrine operates as a substitute for implied malice, this does not mean that the doctrine results in a 'conclusive presumption' of malice. (See *People v. Dillon, supra,* 34 Cal.3d at p. 475.)" (*Patterson, supra,* 49 Cal.3d at p. 626, fn. 8; accord, *Robertson, supra,* 34 Cal.4th at p. 165.) Therefore, malice has been eliminated as an element of second degree felony murder and there is no unconstitutional mandatory presumption. (*Robertson, supra,* 34 Cal.4th at p. 165.)

### *Dillon motion*

In his motion requesting that the court reduce his conviction from murder to manslaughter, defendant argued that to sentence him "to a life term, in particular, to the statutorily-mandated term of 40 years to life, under the circumstances of this case, considering defendant's personal culpability, would violate the California Constitution's proscription of cruel and unusual punishment. More specifically, it would constitute a disproportionate sentence pursuant to the discussion of *People v. Dillon, supra,* 34 Cal.3d 441." In denying the motion the court stated that, "[b]ased upon the[] circumstances of the case, the statutorily mandated sentence does not, in my opinion, shock the conscience, nor do I think that the sentence specified violates the 8th Amendment, either generally or as applied to this defendant. [¶] Mr. Leon's lack of a felony record has not changed this. The crime was as senseless as any I have seen. It's destroyed the lives of two young men who could have made contributions to society. The jury found the gang allegations to be not true. I recognize that, however, based on the evidence that was presented at the trial, it is hard to find a motive for this killing, other than a misconceived or misguided attempt to achieve respect."

On appeal defendant contends that the trial court erred by failing to grant his *Dillon* motion. He argues that an examination of the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society, yields the conclusion that defendant presents no prospective danger to society whatsoever.

"[A] statutory punishment may violate the constitutional prohibition not only if it is inflicted by a cruel or unusual method, but also if it is grossly disproportionate to the offense for which it is imposed." (*People v. Dillon, supra,* 34 Cal.3d at p. 478, fn. omitted.) In *In re Lynch* (1972) 8 Cal.3d 410, the California Supreme Court offered three "techniques" for evaluating whether a particular punishment is excessive. The first of these techniques involves an examination of "the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society." (*Lynch,*

28

*supra*, 8 Cal.3d at p. 425.) *Dillon* refined this technique, explaining that a court should consider "not only the offense in the abstract" but "the totality of the circumstances surrounding the commission of the offense in the case at bar, including such factors as its motive, the way it was committed, the extent of the defendant's involvement, and the consequences of his act." (*Dillon*, *supra*, 34 Cal.3d at p. 479.) As to the offender, the court should consider "whether the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind." (*Ibid.*)

At the time he was sentenced, defendant was 27 years old, and had two misdemeanor convictions, one for defrauding radio/telephone service and one for disturbing the peace. Prior to his arrest in this case he had been working as an assistant manager at a Petco store. He told Detective Anderson prior to trial and the probation officer preparing the pre-sentencing report that he did not intend to shoot or kill the victim. However, defendant admittedly discharged a firearm at an occupied motor vehicle, which was an intentional and deliberate act that was inherently dangerous to the human lives inside the vehicle. At the time defendant discharged a firearm at the motor vehicle, the victim was attempting to leave the area immediately after committing no more than an attempted truck burglary or vandalism, neither of which threatened death or great bodily injury to defendant, his family, or the owner of the truck. Yet, as a natural consequence of defendant's act of discharging a firearm at the occupied motor vehicle, the victim, who was sitting in the passenger seat next to the door defendant shot at, was struck by the bullet defendant discharged, and died. Given defendant's intentional and deliberate commission of an act that was inherently dangerous to human life, the resulting death of the victim, and the seemingly trivial motive behind defendant's decision to commit the act which resulted in death, we cannot say that the mandatory sentence of 40 years to life is grossly disproportionate to the offense for which it was imposed. The court did not err in denying defendant's *Dillon* motion.

29

**DISPOSITION**

The judgment is affirmed.

_____
BAMATTRE-MANOUKIAN, ACTING P.J.

WE CONCUR:

_____
MIHARA, J.

_____
MCADAMS, J.

30