1
2
3
4
5
6
7

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

8    DAVID LEON,                                    No. C 07-3954 MHP

9                    Petitioner,

10      v.                                          <u>**MEMORANDUM & ORDER**</u>

                                                    **Re:  Petition for Writ of Habeas Corpus**
11   TOM FELKER,

12                   Respondent.

13   _____/

14         Petitioner David Leon, a California prisoner incarcerated at the California State Prison in

15   Susanville, filed this petition for writ of habeas corpus pursuant to 28 U.S.C. section 2254.  This

16   matter—wherein Leon challenges the constitutional validity of his convictions—is now before the

17   court for consideration on the merits.  For the reasons set forth below, the petition is granted in part.

18

19   <u>BACKGROUND</u>

20         Unless otherwise indicated, all background facts are taken from the California Court of

21   Appeal decision denying petitioner's request for relief.  *People v. Leon*, No. H028370, 2006 WL

22   2988981 (Cal. Ct. App. Oct. 20, 2006).

23         On December 26, 2003, petitioner was charged with:  1) the murder of Enrique Hernandez;

24   2) discharging a firearm at an occupied motor vehicle; and 3) assault with a firearm.  The charging

25   document further alleged that petitioner personally and intentionally discharged a firearm during the

26   commission of the offenses in counts one and two, that he personally used a firearm during the

27   commission of the offense in count three, and that he committed all the offenses for the benefit of a

28

United States District Court

For the Northern District of California

criminal street gang.  On May 28, 2004, the trial court granted defendant's motion to dismiss count three.  At trial, the following evidence was presented.

I.     The prosecution's case

In 2002, eighteen-year-old Hernandez was a member of the Sureno SST gang.  Sometime around midnight on November 15, 2002, Hernandez and his girlfriend were driving by a market on Fair Oaks in Sunnyvale in her green Honda Civic when Hernandez yelled "hey, what's up" to petitioner, who was walking outside the market.  Hernandez, who had been drinking, jumped out of the car and ran up to petitioner, yelling.  A fist fight ensued.  Petitioner fell down, got up, and ran away.  Hernandez ran after him, whistling for some nearby fellow gang members to join him, and his girlfriend followed in her car.  Petitioner, his brother and his neighbor Jesse Bynum, who had joined petitioner, disappeared near a house on America Avenue.  Hernandez ran to where petitioner and the others disappeared, and called out for them to come back and fight.  Four Sureno gang-member friends joined Hernandez on the street.  After Hernandez told his friends what had happened, he returned to his girlfriend's car.  She dropped Hernandez off at his friend's apartment complex on Fair Oaks, where he promised to stay, and she then drove home.

Petitioner and his brother hid inside their parents' home on America Avenue.  After Hernandez left, petitioner acquired a handgun and returned to the street.  The men who were with Hernandez had also left, but soon returned.  Upon their return, petitioner fired a shot into the air and ran after the men with his brother and Bynum.  After the men scattered, petitioner, his brother and Bynum returned to petitioner's parents' kitchen.

A couple of hours later, around 2:00 a.m. on November 16, 2002, Hernandez called his girlfriend to pick him up.  On the way home, Hernandez directed her to drive back to America Avenue and told her to stop in front of a particular house.  She passed the house and then made a U-turn.  She turned off her headlights and drove slowly down the street and stopped where he told her to stop, next to Bynum's pickup truck.  Hernandez got out of the car, leaving the door open, and started punching the window of the truck while yelling that people could not mess with his friends.

United States District Court

For the Northern District of California

It was around 2:30 a.m., and a porch light went on in a nearby house. Hernandez's girlfriend asked him to get back in the car.

Meanwhile, petitioner, Bynum and another neighbor were outside a neighbor's house behind some bushes at the fence line. Hernandez's girlfriend saw movement in those bushes and then saw petitioner come around the bushes and jog down the middle of the street toward her car with his hands in his sweatshirt pockets. When Hernandez saw petitioner, he jumped back into the Civic and said "go, babe, go." Hernandez's girlfriend turned on her headlights, put the car in gear, and stepped on the gas. Because it looked as though she might hit petitioner, she took her foot off the gas and the car slowed. Petitioner changed directions and came along the passenger side of the car. When petitioner was outside the passenger window, about three feet from it, there was a loud bang. Hernandez's girlfriend looked back and saw petitioner continue down the street and run across a lawn as she was driving away. Petitioner ran into his parents' house.

Hernandez yelled, "I got shot." He pulled up his shirt and showed his girlfriend that he was bleeding from a hole in his chest. A bullet had entered above his right chest and exited on the left side of his body. He started gasping for air. The two drove back to Hernandez's friend's apartment complex to ask for help. Hernandez died at the hospital that morning.

Later in the morning of November 16, 2002, investigating officers found a bullet hole in the front passenger side door of the Civic, just below the window. The hole went through the door at a rearward and downward angle. Inside the car, officers found a bullet on the floorboard between the front passenger seat and the door, a BB/pellet gun in the front passenger floorboard area and blood stains. Officers found casings for a nine-millimeter pistol on the street just north and south of petitioner's parents' house. Under the couch in the living room of the house, officers found a loaded Star nine-millimeter pistol covered with a washcloth and latex gloves. A criminalist with the Santa Clara County crime laboratory determined that the casings found in the street were fired by the nine-millimeter pistol found inside petitioner's parents' home. The criminalist was not able to determine conclusively whether the same gun fired the bullet found inside the Civic.

United States District Court

For the Northern District of California

Detective Craig Anderson interviewed petitioner around mid-day on November 16, 2002. The interview was tape recorded and the tape was played for the jury. According to the tape, petitioner was walking by the market after midnight when a Mexican male who had been driving by came after him and started a fight. He did not want to fight so he ran home, but the man and a few others ran after him. He went inside, locked the door and went to sleep. The detective told petitioner that petitioner was not being truthful. Petitioner then told the detective that he grabbed a gun, went back outside and shot it once into the air when he saw between six and eight men coming his way. The men scattered. Petitioner's neighbors came out when they heard the shot. Petitioner told them what happened, went back inside and fell asleep on the couch. The detective again told petitioner that petitioner was not being truthful. Petitioner then said that after the police came and went, a truck full of men drove up and down the street. Petitioner and his friends hid in some bushes. Then the Civic from which he was originally attacked drove by with its lights off. A man jumped out of the car and started hitting Bynum's truck with what sounded like BBs, although petitioner did not see a gun. Petitioner ran after the man. When the man saw petitioner, he returned to the Civic without pointing anything at petitioner, and the car sped off. The car swerved a little, but petitioner did not think that the driver was trying to hit him. Petitioner said that he shot at "the bottom half of the door" because he "didn't want to shoot him in the head or nothing like that." He then threw the gun into some bushes and ran back inside his house. Petitioner was arrested at the conclusion of the interview.

II.     The defense case

Alma Gonzalez saw Hernandez get out of his girlfriend's car and start fighting with two men who had come out of a different car outside the Fair Oaks market on the night of November 15, 2002. Later, when she and others were at the apartment complex on Fair Oaks, Hernandez said that the guy he had chased on America Avenue had fired a shot, so that they should all be careful.

On the night of November 16, 2002, Cheuritta Cox, who lived next door to the Leon family, heard her dog barking and people yelling outside. She looked out her kitchen window and saw a circle of people in front of her house and a black car with a girl standing on its open-door frame.

4

United States District Court

For the Northern District of California

Cox assumed that it was a fight over a girl.  She then saw a flash from a gun and heard a gunshot come from petitioner.  She called the police.  The car left but there were still people outside when she checked later.

Criminalists tested a blood sample taken during Hernandez's autopsy.  They determined that he had a blood alcohol level of .09, and he tested positive for methamphetamine and amphetamine.

David Medina used to live around the corner from petitioner's parents' America Avenue home, but did not know petitioner.  He went to school with Hernandez, who was an SST gang member.  When Medina was in school, he was affiliated with the Norteno gang.  He is no longer affiliated with that gang even though he still has gang tattoos.  To his knowledge, petitioner was not a member of his gang, nor was anybody else who lived on America Avenue.  Once, during their freshman year, Hernandez was with at least ten SST gang members when he attacked Medina in the student parking lot.

Omar Guzman also went to school with Medina and Hernandez.  He had never seen petitioner before they were both transported to jail in the same patrol car after petitioner's arrest on November 16, 2002.  Guzman told petitioner that he was Cesar's younger brother after petitioner told Guzman that he looked like Cesar.  Petitioner asked Guzman why he was going to jail.  After Guzman told him that it was for assault with a deadly weapon, Guzman asked petitioner why he was going to jail.  Petitioner said that it was for murder.  Petitioner said that he was walking home from a bar when he was approached by three people who asked if he was a gang member.  They kept harassing him, so when he went home he grabbed a pistol and went outside.  He saw a truck with its lights off approach his house and somebody inside point a gun at his house.  He heard a clicking noise and then fired two shots at the truck.  He said that he told the police what happened.  Petitioner told the transporting officer that he was afraid that there would be retaliation against his family and asked her to have officers patrol the area.

Travis Cox grew up on America Avenue with petitioner.  He considers petitioner to be honest and very respectful.  Petitioner never associated with gangs.

5

Ryan Light went to high school with petitioner and they worked together. He considers petitioner to be honest and does not consider him to be a violent person. Petitioner was not involved in any gang activity that occurred at their high school.

Derrick Stahmer grew up with petitioner on America Avenue. He gave petitioner all of petitioner's tattoos. Petitioner's brother drew the peacock tattoo, and Stahmer testified that he has given the smile-now-cry-later tattoo and the Virgin Mary tattoo to many other people.

Judy Stahmer, Derrick's mother, considers petitioner to be very honest and non-violent. She had never heard of petitioner being involved in gang activity during high school.

Todd Rudy's grandmother has lived on America Avenue for 45 years and he has lived there for six years. He had never seen petitioner be violent in any manner. He has also never had any problems with the occupants of the apartment complex on Fair Oaks.

Stanley Stovall, who worked with petitioner and one of his brothers, has known petitioner's family for most of his life. To his knowledge, no one in the Leon family has ever been involved with gangs. He considers petitioner to be non-violent and honest.

III.   Procedural history

On October 14, 2004, the jury found petitioner not guilty of first degree murder, but guilty of second degree murder, Cal. Penal Code § 187, and of discharging a firearm at an occupied motor vehicle, *id.* § 246. Petitioner was sentenced to an indeterminate term of 15 years to life on the murder count, with a consecutive term of 25 years to life for the firearm use enhancement, and a concurrent term of five years plus 25 years to life on the discharging-a-firearm count.

On April 12, 2006, petitioner filed a petition for a writ of habeas corpus with the California Court of Appeal. On October 20, 2006, the California Court of Appeal affirmed petitioner's judgment on direct appeal, and denied his petition for writ of habeas corpus. *See generally Leon*, 2006 WL 2988981. The California Supreme Court summarily denied review in both cases on February 7, 2007. On September 20, 2007, petitioner filed another writ of habeas corpus in the California Supreme Court. The court denied that petition on March 26, 2008. On August 1, 2007,

1   and March 19, 2008, petitioner filed a petition for writ of habeas corpus and amended petition for

2   writ of habeas corpus, respectively.

3

4   LEGAL STANDARD

5       The court is required to analyze state habeas corpus claims under the Antiterrorism and

6   Effective Death Penalty Act of 1996 ("AEDPA").  28 U.S.C. § 2254.  AEDPA established a

7   "substantially higher threshold for habeas relief" with the "acknowledged purpose of reducing

8   delays in the execution of state and federal criminal sentences."  *Schiro v. Landrigan*, 550 U.S. 465,

9   475 (2007) (quoting *Woodford v. Garceau*, 538 U.S. 202, 206 (2003)).

10      Under AEDPA, the court may entertain a petition for writ of habeas corpus "in behalf of a

11  person in custody pursuant to the judgment of a state court only on the ground that he is in custody

12  in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The

13  petition may not be granted with respect to any claim that was adjudicated on the merits in state

14  court unless the state court's adjudication of the claim resulted in a decision that was:  1) "contrary

15  to, or involved an unreasonable application of, clearly established Federal law, as determined by the

16  Supreme Court of the United States;" or 2) "based on an unreasonable determination of the facts in

17  light of the evidence presented in the State court proceeding."  *Id.* § 2254(d).

18      "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court

19  arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the

20  state court decides a case differently than [the] Court has on a set of materially indistinguishable

21  facts."  *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).  "Under the 'unreasonable

22  application' clause, a federal habeas court may grant the writ if the state court identifies the correct

23  governing legal principle from [the] Court's decision but unreasonably applies that principle to the

24  facts of the prisoner's case."  *Id.* at 413.  "[A] federal habeas court may not issue the writ simply

25  because that court concludes in its independent judgment that the relevant state-court decision

26  applied clearly established federal law erroneously or incorrectly.  Rather, that application must also

27  be unreasonable."  *Id.* at 411.  A federal habeas court making the "unreasonable application" inquiry

28

**United States District Court**
For the Northern District of California

7

1   should ask whether the state court's application of clearly established federal law was "objectively

2   unreasonable." *Id.* at 409.

3   　　　AEDPA requires federal habeas courts to "presume the correctness of state courts' factual

4   findings" unless the petitioner presents "clear and convincing evidence." *Schiro*, 550 U.S. at 473-74

5   (citing 28 U.S.C. § 2254(e)(1)).  In other words, "the question under AEDPA is not whether a

6   federal court believes the state court's determination was incorrect but whether that determination

7   was unreasonable—a substantially higher threshold." *Id.* at 473.

8   　　　The California Supreme Court denied petitioner's claims without opinion and the California

9   Court of Appeal issued the last reasoned state court opinion.  The court thus will review the opinion

10  of the Court of Appeal under AEDPA standards.  *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991);

11  *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005).  For issues where there exists no

12  reasoned opinion by the Court of Appeal, the court will independently review the denial to

13  determine whether the state court's conclusion was objectively unreasonable.  *Himes v. Thompson*,

14  336 F.3d 848, 853 (9th Cir. 2003).

15

16  DISCUSSION

17  　　　Petitioner claims numerous independent errors:  1) ineffective assistance of trial counsel in

18  contravention of constitutional guarantees; 2) due process errors based on the trial court's failure to

19  give certain instructions that were not requested, failure to give certain instructions that were

20  requested, and decision to give certain prejudicial instructions; and 3) due process and equal

21  protection errors based on the trial court's instructions regarding second degree felony-murder, in

22  light of the merger doctrine and the collateral purpose rule.  Each is discussed in turn.

23  I.   　Ineffective assistance

24  　　　Petitioner argues that he was deprived of the effective assistance of counsel when his trial

25  attorney failed to argue, during the closing argument, that a person who has been previously

26  threatened or assaulted by another may act more quickly and harshly in self-defense than a person

27  who has not been previously threatened or assaulted.  Petitioner concedes that the trial court did in

28

　　　　　　　　　　　　　　　　　　　　　　　8

1   fact give the appropriate jury instruction regarding this concept; instead, he bases his claim on his

2   counsel's failure to mention this concept during the closing argument.

3        Claims of ineffective assistance of counsel are examined under the standard set forth in

4   *Strickland v. Washington*, 466 U.S. 668 (1984). The benchmark for judging any claim of

5   ineffectiveness is whether counsel's conduct so undermined the proper functioning of the adversarial

6   process that the trial cannot be relied upon as having produced a just result. In order to prevail on an

7   ineffectiveness of counsel claim, petitioner must establish two prongs. Firstly, he must establish that

8   counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness"

9   under prevailing professional norms. *Id.* at 687-88. The relevant inquiry is not what defense

10  counsel could have done, but rather whether the choices made by defense counsel were reasonable.

11  *Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998), *cert. denied* 525 U.S. 1159 (1999).

12  Judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a

13  strong presumption that counsel's conduct falls within the wide range of reasonable professional

14  assistance. *Strickland*, 466 U.S. at 689. Secondly, he must establish that he was prejudiced by

15  counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's

16  unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A

17  reasonable probability is probability sufficient to undermine confidence in the outcome. *Id.*

18       Petitioner's argument was summarily denied by the state appellate court without opinion.

19  Therefore, the court will examine the denial independently under AEDPA standards. It is

20  undisputed that the following jury instruction was given at trial:

21       In addition, a person whose life or safety has been previously threatened or assaulted
         by another, is justified in acting more quickly and taking harsher measures for self
22       protection from an assault by that person, than would a person who had not received
         threats or had previously been assaulted by the same person.
23

24  It is also undisputed that trial counsel failed to recite the quickly and harshly language of the

25  instruction during his closing argument. Counsel, however, gave a thorough argument of the facts of

    petitioner's case and emphasized the concept conveyed in the jury instruction without actually using
26
    the words "quickly and harshly." He repeatedly discussed petitioner's state of mind at the time of
27
    the shooting, and how it was affected by the prior events of the evening. Docket No. 23 (Answer),
28

9

Exh. C (Reporter's Transcript) at 2114.  He also paraphrased petitioner's statements during

petitioner's interview at the police station:  "I was scared out of my ass . . . when I fired the gun, so I

shot at the door."  *Id.* at 2118.  Counsel even stated that "that whole night, all [petitioner] wanted to

do was get out, have his family, his home, be safe from this gangster who's repeatedly coming by."

*Id.* at 2120.  These statements demonstrate the emphasis placed by petitioner's trial counsel on the

threats and assaults that had occurred prior to the slaying.  Although counsel did not cite the

instruction or use the magic words "quickly and harshly," he harped on the theme throughout his

argument.  In light of counsel's reference to the concept embodied in the instruction, his

performance did not fall below an objective standard of reasonableness.  Consequently, petitioner's

claim is denied.

   Even if counsel was somehow deficient in his representation, petitioner was not prejudiced.

The jury was aware of the quickly and harshly standard because it had been instructed on the

concept by the trial judge.  The fact that petitioner's counsel did not explicitly recite this language

during his closing argument does not erase the instruction from the minds of the jurors.  Counsel's

decision to discuss self-defense in a thematic manner instead of parroting the jury instruction

language is not prejudicial, and petitioner's claim for ineffective assistance of counsel is denied for

this additional reason.

II.   Jury instructions

   The fact that a jury instruction violates state law is not, by itself, a basis for federal habeas

corpus relief.  *Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006) *cert. denied*, 549 U.S. 1027.

"Federal habeas courts therefore do not grant relief, as might a state appellate court, simply because

the instruction may have been deficient in comparison to the CALJIC model."  *Id.* (citing *Estelle v.

McGuire*, 502 U.S. 62, 72 (1991)).  Rather, the issue before the federal court is "whether the ailing

instruction by itself so infected the entire trial that the resulting conviction violates due process."  *Id.*

(quoting *Estelle*, 502 U.S. at 72).

   "The burden on the habeas petitioner is 'especially heavy' where . . . the alleged error

involves the failure to give an instruction."  *Id.* (quoting *Hendricks v. Vasquez*, 974 F.2d 1099, 1106

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

(9th Cir. 1992)).  However, failure to give an instruction on a theory of the defense will violate due process if the theory is legally sound and evidence in the case makes it applicable.  *Id.* at 904-05. The petitioner must show that "the alleged instruction error had substantial and injurious effect or influence in determining the jury's verdict."  *Id.* (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).  This means that there is a "reasonable probability" that the jury would have arrived at a different verdict had the instruction been given.  *Id.* at 916.  A petitioner is not entitled to an instruction embodying a defense theory if the evidence does not support it.  *Id.*

> A.    *Sua sponte* instructions

Petitioner contends that the trial court erred by failing to instruct the jury, *sua sponte*, that a citizen may justifiably kill the perpetrator of a burglary when the nature of the crime is such that it yields a reasonable fear of death or great bodily injury.  Specifically, petitioner claims that the following instructions should have been given:

> Homicide is justifiable and not unlawful when committed by any person who is resisting an attempt to commit a forcible and atrocious crime.
>
> An auto burglary is a forcible and atrocious crime when the manner of its commission threatens, or is reasonably believed by the petitioner to threaten life or great bodily injury so as to instill a reasonable fear of death or great bodily injury in the petitioner.
>
> An attempted auto burglary is shown when there is evidence to establish each of the following elements:  (1) a person attempted to enter an automobile when the doors were locked; and (2) at the time of the attempted entry, the person had the specific intent to commit damage inside of the automobile which would rise to the value of $400 or more.
>
> An attempt to commit a crime consists of two elements, namely a specific intent to commit the crime, and a direct but ineffectual act done toward its commission.
>
> In determining whether this act was done, it is necessary to distinguish between mere preparation, on the one hand, and the actual commencement of the doing of the criminal deed on the other.  Mere preparation, which may consist of planning the offense or of devising, obtaining or arranging the means for its commission, is not sufficient to constitute an attempt where those acts clearly indicate a certain, unambiguous intent to commit that specific crime.  These acts must be an immediate step in the present execution of the criminal design, the progress of which would be completed unless interrupted by some circumstance not intended in the original design.
>
> The burden is on the prosecution to prove beyond a reasonable doubt that an attempted auto burglary which threatened death or great bodily injury did not occur.

United States District Court

For the Northern District of California

Petitioner further contends that the trial court should have instructed the jury, again *sua sponte*, regarding the affirmative defense found in California Penal Code section 197, subdivision 2, which states:

> Homicide is also justifiable when committed by a person in any of the following cases . . . [w]hen committed in defense of habitation, property, or person against someone who manifestly intends to or endeavors, by violence or surprise, to commit a felony, or against one who manifestly intends and endeavors, in a violent, riotous or tumultuous manner, to enter the habitation of another for the purpose of offering violence to any person therein.

The California Court of Appeal denied petitioner's claims regarding these instructions, reasoning that "there was not substantial evidence supportive of justification based on an attempted auto burglary that threatened death or great bodily injury." *Leon*, 2006 WL 2988981 at *11. This conclusion is not contrary to or an unreasonable application of federal law, nor is it based on an unreasonable determination of the facts in light of the evidence presented.

In California, deadly force may be used in defense of property only when the person threatening the property is committing a forcible or atrocious crime. *People v. Ceballos*, 12 Cal. 3d 470, 478-79 (1974). A burglary is considered a forcible and atrocious crime only where it threatens death or bodily harm. *Id.* at 479. The state court's determination—that the evidence does not support a defense theory that petitioner reasonably acted to resist an attempted auto burglary that threatened death or great bodily harm—was not objectively unreasonable because there was no one in or around the neighbor's vehicle at the time Hernandez allegedly attempted to burglarize it. It was also not objectively unreasonable for the state court to find that Hernandez's alleged actions toward petitioner's neighbor's car did not instill a reasonable fear of death or great bodily injury in the petitioner. Indeed, petitioner admits that Hernandez did not know of petitioner's whereabouts when Hernandez was allegedly burglarizing the vehicle. Finally, petitioner's claim that he heard a BB gun is also not sufficient to make the instructions applicable. *See Beardslee v. Woodford*, 358 F.3d 560, 577 (9th Cir. 2004) (as amended) ("[f]ailure to instruct on the defense theory of the case is reversible error if the theory is legally sound and evidence in the case makes it applicable."). Hernandez never pointed the BB gun at petitioner and petitioner never saw the BB gun in Hernandez's possession. Moreover, Hernandez did not even know that petitioner was in the

12

United States District Court

For the Northern District of California

vicinity. *Nakashima v. Takase* does not support petitioner's claim either. 8 Cal. App. 2d 35, 37 (1935). Unlike here, the defendant in *Nakashima* was present inside his store while it was being burglarized. He was therefore threatened with death or serious bodily harm. Here, petitioner was not in or near the vehicle when it was allegedly being burglarized. Therefore, the failure to give the above instructions did not have a substantial and injurious effect or influence in determining the jury's verdict.[1]

Petitioner also contends that the trial court erred when it failed to instruct the jury, *sua sponte*, that "a citizen may use deadly force in order to apprehend a fleeing burglar." Specifically, petitioner argues that the trial court should have given CALJIC No. 5.25 which provides, "Homicide is justifiable and not unlawful when necessarily committed in attempting by lawful ways and means . . . to apprehend any dangerous person who has committed a felony." The California Court of Appeal denied this claim because the instruction was not supported by the evidence. Specifically, it held that this instruction only applies when the underlying felony poses a threat of death or serious bodily injury to others. *Leon*, 2006 WL 2988981 at *9. As discussed above, it was not objectively unreasonable to find that Hernandez's actions did not constitute a forcible or atrocious crime because there was no threat of death or serious bodily injury to anyone. Therefore, the Court of Appeal's conclusion is not contrary to or an unreasonable application of federal law, nor is it based on an unreasonable determination of the facts in light of the evidence presented. Petitioner's claim is denied.

B.     <u>Requested instructions</u>

Petitioner contends that the trial court erred by refusing to give a jury instruction regarding the amount of force that may be used in defense of property. At trial, petitioner requested that the court instruct the jury with CALJIC No. 5.43, which provides:

> When conditions are present which, under the law, justify a person in using force in defense of property, that person may use that degree and extent of force as would appear to a reasonable person, placed in the same position, and seeing and knowing what the resisting person then sees and knows, to be reasonably necessary to prevent imminent injury threatened to the property. Any use of force beyond that limit is excessive and unjustified, and anyone using excessive force is legally responsible for the consequences thereof.

1   The California Court of Appeal held that this requested instruction was not supported by the

2   evidence.  It noted that "[h]omicide is justifiable when committed by a person defending property

3   when the person threatening the property manifests an intent to commit a forcible and atrocious

4   crime." *Leon*, 2006 WL 2988981 at *7.  It concluded that because Hernandez's attempted burglary

5   did not threaten great bodily harm, petitioner was not justified in using deadly force as a matter of

6   law; therefore, it held that the proposed instruction was not required.  *Id.*  The requested instruction

7   was also found unnecessary because use of deadly force is not justified in defense of property.  *Id.*

8       AEDPA requires federal habeas courts to "presume the correctness of state courts' factual

9   findings" unless the petitioner presents "clear and convincing evidence." *Schiro*, 550 U.S. at 473-74

10  (citing 28 U.S.C. § 2254(e)(1)).  The California Court of Appeal's determination is not based on an

11  unreasonable determination of the facts because the evidence demonstrates that Hernandez was

12  attempting to retreat when he was shot.  Petitioner has not made a clear and convincing showing of a

13  lack of retreat, except to argue that the retreat was only a few seconds old.  This is not clear and

14  convincing evidence that there was no retreat, and therefore the trial court did not err in refusing to

15  give the instruction regarding defense of property.  Petitioner's reliance on *Calvillo-Silva v. Home*

16  *Grocery*, 19 Cal. 4th 714 (1998), fails for the same reason.  Nor was the state court's decision

17  contrary to or an unreasonable application of federal law.  Under California law, deadly force may

18  only be used to defend property to resist a forcible and atrocious crime, and no federal law finds this

19  to be constitutionally impermissible.

20      Petitioner also contends that the trial court erred by refusing to give his proposed instruction

21  that a BB gun is a dangerous or deadly weapon.  Petitioner requested the following instruction:

22      A pellet gun, such as the weapon in evidence in this case, constitutes a deadly and
        dangerous weapon as a matter of law.  As a deadly and dangerous weapon, a pellet
23      gun is capable of inflicting great bodily injury.

24  The Court of Appeal denied this claim because the instruction was not supported by the evidence.

25  The court concluded that petitioner could not have thought "he faced an objective risk of imminent

26  harm from a BB/pellet gun." *Leon*, 2006 WL 2988981 at *9.

27

28

United States District Court

For the Northern District of California

1    The Court of Appeal's decision was not an unreasonable determination of the facts in light of

2    the evidence presented.  Hernandez never pointed the BB gun at petitioner and petitioner never saw

3    the BB gun in Hernandez's possession.  This instruction is not constitutionally necessary simply

4    because petitioner later told an officer that he heard what sounded like BB's or that he believed

5    Hernandez was shooting the BB gun.  The state court reasonably concluded that even though

6    petitioner may have heard the sound of BB's, because petitioner never saw the BB gun in

7    Hernandez's possession, he could not have reasonably feared imminent harm from the BB gun.

8    Indeed, petitioner admits that Hernandez did not know of petitioner's whereabouts when Hernandez

9    was allegedly burglarizing the vehicle.  For the same reasons, the state court's implicit

10   conclusion—that petitioner's belief regarding possession of the BB gun by Hernandez was not

11   objectively reasonable—was not in itself an objectively unreasonable determination.  The state court

12   properly concluded that this instruction was not necessary because the instruction is not supported

13   by the evidence.  Likewise, the failure to give the instruction was also not contrary to or an

14   unreasonable application of federal law.

15        C.    Prejudicial instructions

16        Petitioner claims that the trial court erred by giving two instructions that improperly advised

17   the jury on the theory of self-defense by an aggressor and contrived self defense claims.  Pursuant to

18   CALJIC No. 5.54, the trial court instructed the jury that:

19        The right to self defense is only available to a person who initiated an assault if he
           has done all the following:  (1) He has actually tried in good faith to refuse to
20         continue fighting; (2) He has clearly informed his opponent by either words or
           conduct that he wants to stop fighting; and (3) He has clearly informed his opponent
21         by either words or conduct that he has stopped fighting.  After he has done these three
           things, he has the right to self defense if his opponent continues to fight.
22
23   Pursuant to CALJIC No. 5.55, the trial court instructed the jury that:

         The right of self-defense is not available to a person who seeks a quarrel with the
24       intent to create a real or apparent necessity of exercising self-defense.

25   Petitioner contends that there was no factual basis for either of these instructions because petitioner

26   was not an aggressor as a matter of law, and because petitioner did not engage in a "quarrel" with

27   Hernandez.

28
                                           15

United States District Court

For the Northern District of California

An improper jury instruction will only violate due process where the error had substantial and injurious effect or influence in determining the jury's verdict. The California Court of Appeal held that the instructions were not improper because the facts of the case could support the instructions depending on how the jury interpreted the facts. *Leon*, 2006 WL 2988981 at *8. The court also held that even if the instructions were improper, they did not prejudice petitioner because "in most cases the giving of an [instruction that is correct in law but irrelevant] is only a technical error which does not constitute ground for reversal." *Id.* The jury was instructed that not all instructions would be applicable to the facts as they determined them. With respect to CALJIC 5.54, if the jury determined that petitioner was not the aggressor, they would have ignored this instruction. Similarly, with respect to CALJIC 5.55, if the jury determined that petitioner did not commence the conflict in order to use a contrived plea of self defense, they would have ignored this instruction. However, if the jury determined that petitioner was the aggressor or sought to use a contrived plea of self defense, the associated instruction would be relevant. Therefore, petitioner cannot demonstrate any harm from these instructions. Indeed, numerous instructions regarding the defense theory of the case were also given, and the jury could have, if it chose, relied on those instructions. *Leon*, 2006 WL 2988981 at *7 (listing instructions).

Furthermore, with respect to CALJIC 5.54, it would be reasonable for the jury to conclude that petitioner was an aggressor not entitled to self-defense. Petitioner's argument that he could not be an aggressor as a matter of law is unconvincing. His only support is a reference to *People v. Bloyd*, 43 Cal. 3d 333 (1987). There, the defendant claimed that he was awakened by a gunshot and went to investigate. *Id.* at 354. He then emerged from the home in which he was staying, and found the decedent standing at the doorstep, pointing a gun directly at him. *Id.* According to the defendant, he then attempted to wrestle the gun away when it accidentally discharged and killed the decedent. *Id.* at 344. The court found that it was unnecessary to give an instruction regarding an initial aggressor acting in self defense because a defendant in that situation could never be the original aggressor: he did not have a weapon, he was confronted outside his own doorstep, and the decedent was pointing a gun directly at him. *Id.* *Bloyd* does not stand for the proposition that any

16

**United States District Court**
For the Northern District of California

1    person investigating any crime cannot be an aggressor as a matter of law.  In contrast to *Bloyd*,

2    petitioner was armed with a loaded gun whereas Hernandez was not, nor did Hernandez ever point

3    any sort of a gun at petitioner, including a BB gun.

4    　　　Similarly, with respect to CALJIC 5.55, the trial court's determination was not objectively

5    unreasonable.  Petitioner correctly states that "the common sense basis for the rule embodied in No.

6    5.55 is that a petitioner cannot commence a conflict with someone and then use a contrived plea of

7    self defense in order to retroactively justify what was essentially an unprovoked criminal assault."

8    Docket No. 25 (Traverse) at 22 (citing *People v. Conkling*, 111 Cal. 616 (1896), *People v. Keys*, 62

9    Cal. App. 2d 903 (1944), *People v. Garnier*, 95 Cal. App. 2d 489 (1950)).  However, petitioner

10   cannot demonstrate that CALJIC 5.55 cannot be supported by the facts here.  The jury could have

11   reasonably found that petitioner lay-in-wait behind his neighbor's bushes in order to surprise

12   Hernandez, and thereafter himself created a deadly situation while Hernandez was retreating.

13   　　　In sum, the California Court of Appeal's denial of petitioner's claims regarding these

14   instructions was not contrary to or an unreasonable application of federal law, nor was it based on an

15   unreasonable determination of the facts in light of the evidence presented.

16   III.　　Felony-murder

17   　　　Petitioner raises a number of issues regarding the state court's application of the second

18   degree felony-murder doctrine.  He claims that instructing the jury regarding felony-murder and

19   allowing a second degree felony-murder conviction based upon the felony of discharging a firearm

20   into an occupied vehicle is a due process violation.  He also claims that the trial court's refusal to

21   apply the collateral purpose rule led to both a due process and an equal protection violation.  The

22   California Supreme Court recently addressed the validity of these claims in *People v. Chun*, 45 Cal.

23   4th 1172 (2009).  *Chun* was decided after petitioner's conviction became final and after this federal

24   petition had been submitted.

25   　　　According to *Chun*, California Penal Code section 187(a) defines murder as "the unlawful

26   killing of a human being, or a fetus, with malice aforethought."  *Id.* at 1181.  The crime of murder

27   includes malice as an element, defined in section 188, which may be either express or implied.  *Id.*

28

It is implied "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." *Id.* A defendant may also be found guilty of murder under the felony-murder rule. *Id.* at 1182. The felony-murder rule makes a killing, while committing certain felonies, a murder without the necessity of further examining the defendant's mental state. *Id.* The rule has two applications: first degree felony-murder and second degree felony-murder. *Id.* First degree felony-murder is a killing during the course of a felony specified in Section 189, such as rape, burglary or robbery. *Id.* Second degree felony-murder is "an unlawful killing in the course of the commission of a felony that is inherently dangerous to human life but is not included among the felonies enumerated in section 189 . . . ." *Id.* (citing *People v. Robertson*, 34 Cal. 4th 156, 164 (2004)).

The "merger doctrine" states that the underlying felony in a second degree felony-murder charge must be an independent crime, and not the killing itself. *Id.* at 1189. Thus, certain underlying felonies "merge" with the homicide and cannot be used for purposes of felony-murder. *Id.* For example, because assault with a deadly weapon is usually an integral part of the homicide, it merges and cannot support a charge of second degree felony-murder. *Id.* (citing *People v. Ireland*, 70 Cal. 2d 522 (1969)). Where it is not clear whether the underlying felony should merge with the homicide, the California Supreme Court until last year applied the "collateral purpose rule." Under this rule, the underlying felony would generally merge with the homicide if the purpose of the felony was to injure or assault the victim. The underlying felony would not merge with the homicide if there was an independent purpose to the felony. *See People v. Robertson*, 34 Cal. 4th 156, 173 (2004) (felony of negligent discharge of a firearm did not merge where the defendant fired into the air to frighten away a group of men); *see also People v. Randle*, 35 Cal. 4th 987, 1005 (2005) (felony of negligent discharge of a firearm merged where defendant admitted that he shot at the victim).

The California Supreme Court re-evaluated second degree felony-murder and the merger doctrine in *Chun*, 45 Cal. 4th 1172. The *Chun* court first found that the second degree felony-murder doctrine was rooted in statutory law and re-affirmed its constitutional validity. *Id.* at 1183-

United States District Court
For the Northern District of California

89.  The court then examined the continued application of the "merger doctrine" to felonies that are assaultive in nature.  *Id.* at 1197-1202.  The court overruled three controlling California Supreme Court cases, *People v. Hansen*, 9 Cal.4th 300 (1994), *Robertson*, 34 Cal. 4th 156, and *Randle*, 35 Cal. 4th 987, and held that "[w]hen the underlying felony is assaultive in nature, such as [discharging a firearm into an occupied vehicle and similar crimes], we now conclude that the felony merges with the homicide and cannot be the basis of a felony-murder instruction."  *Chun*, 45 Cal. 4th at 1200.  Thus, were petitioner being tried today, the discharging of a firearm at an occupied motor vehicle charge against him would merge into the second degree murder charge against him, and therefore could not form the basis for a second degree murder conviction based on the felony-murder rule.

As a threshold matter, petitioner contends that the second degree felony-murder instruction caused the jury to presume that the element of malice had been proven.  Petitioner claims that while the *first degree* felony-murder rule has been routinely approved of, there is a statutory exception for that rule—California Penal Code section 189—and it is therefore constitutional.  Because there is no such statutory exception for second degree felony-murder, he contends it is invalid.  However, petitioner fails to indicate how this long-existing rule is contrary to clearly established federal law.  There are no Supreme Court cases specifically disapproving of state felony-murder statutes.  Instead, the Supreme Court seems to have shown approval for such felony-murder statutes.  *See Locket v. Ohio*, 438 U.S. 586, 602 (1978) ("That States have authority to make aiders and abettors equally responsible, as a matter of law, with principals, or to enact felony-murder statutes is beyond constitutional challenge.").

Petitioner references *Carella v. California*, 491 U.S. 263, 265-66 (1989), which prohibits "conclusive presumptions" as to core elements of a crime.  There is no conclusive presumption here.  The California Court of Appeal correctly rejected this claim, explaining that "[a]lthough the second degree felony-murder doctrine operates as a substitute for implied malice, this does not mean that the doctrine results in a conclusive presumption of malice."  *Leon*, 2006 WL 2988981 at *15 (citing *People v. Dillon*, 34 Cal.3d. 441, 475 (1983)) (internal quotations omitted).  This reasoning, that the

19

United States District Court

For the Northern District of California

second degree felony-murder acts as a substitute for implied malice and is not a conclusive

presumption, and has been used to support the constitutionality of California's second degree felony-

murder rule on numerous occasions.  *See People v. Patterson*, 49 Cal. 3d 615 (1989); *Robertson*, 34

Cal. 4th 156.  *Chun* is also in accord.  It explained that "although [the rule] derived from the

common law, [it] is based on statute."  45 Cal. 4th at 1183.  It stated that "[t]he felony-murder rule

'acts as a substitute' for conscious-disregard-for-life malice.  It simply describes a different form of

malice under section 188.  'The felony-murder rule imputes the requisite malice for a murder

conviction to those who commit a homicide during the perpetration of a felony inherently dangerous

to human life.'"  *Id.* at 1181-84 (internal citations omitted).  Because this substitution is not a

conclusive presumption, the California Court of Appeal's reasoning is not contrary to or an

unreasonable application of federal law.

In light of *Chun*, the court requested that the parties provide supplemental briefing on

whether it applies retroactively to defendants whose convictions are final.  *Chun* does not specify

whether it is retroactively applicable and the court declines to so speculate.  "'The retroactivity of a

state change of law is a state question and the federal Constitution has no voice upon the subject.'"

*La Rue v. McCarthy*, 833 F.2d 140, 142 (9th Cir. 1987) (quoting *Northrop v. Alexander*, 642 F.

Supp. 324, 327 (N.D. Cal. 1986) (Lynch, J.)).  Therefore, this matter of state law must first be

exhausted in state court before the court can determine its compliance with federal law.

Petitioner also claims that he was wrongly convicted under the "already existing, but

unspoken, rule that shooting at an occupied vehicle will not support a second degree felony-murder

theory."  Docket No. 37 (Petitioner's Supp. Brief) at 3.  This is not an argument concerning the

retroactive application of *Chun*.  Rather, petitioner is arguing that *Chun* clarified the law as it existed

when he was convicted and therefore the jury should not have been instructed on second degree

felony-murder.  This issue need not be exhausted because petitioner has already presented his

felony-murder arguments to the state courts on multiple occasions.  *See Roberts v. LaVallee*, 389

U.S. 40, 43 (1967) (" Still more state litigation would be both unnecessarily time-consuming and

otherwise burdensome.  This is not a case in which there is any substantial state interest in ruling

**United States District Court**
For the Northern District of California

once again on petitioner's case.  We can conceive of no reason why the State would wish to burden

its judicial calendar with a narrow issue the resolution of which is predetermined by established

federal principles.").

The jury was instructed that it could convict petitioner of second degree murder on one of

two bases:  1) upon a finding of malice; or 2) upon a finding that the killing occurred during the

commission of the felony of discharging a firearm into an occupied vehicle.  If the holding in *Chun*

was a clarification of the merger doctrine as it existed at the time petitioner's conviction became

final, then it was improper to give the second instruction because such a felony would merge with

the homicide.  *See Fiore v. White*, 531 U.S. 225 (2001) (if the law as it exists at the time of

conviction is later clarified, then the government's failure to meet the requirements set forth in the

clarification violates due process).  *Chun* held:

> The tests stated in *Hansen* and in *Robertson* and *Randle* cannot both apply at the same time.  If *Hansen* governs, the underlying felony will *never* merge.  If *Robertson* and *Randle* govern, the underlying felony will *always* merge unless the court can discern some independent felonious purpose.  But we see no principled basis by which to hold that a violation of *section 246* never merges, but a violation of *section 246.3* does merge unless done with an independent purpose.  We also see no principled test that another court could use to determine which approach applies to other possible underlying felonies.  The court in *People v. Bejarano*, *supra*, 149 Cal.App.4th 975, implicitly concluded that Robertson and Randle now govern to the exclusion of the *Hansen* test.  We agree.  The *Robertson* and *Randle* test and the *Hansen* test cannot coexist.  Our analyses in *Robertson* and *Randle* implicitly overruled the *Hansen* test.  We now expressly overrule *People v. Hansen*, supra, 9 Cal.4th 300, to the extent it stated a test different than the one of *Robertson* and *Randle*.  Doing so also requires us to disapprove of *People v. Tabios*, *supra*, 67 Cal.App.4th 1.

45 Cal. 4th at 1198-99.  The California Supreme Court's holding that "[o]ur analyses in *Robertson*

and *Randle* implicitly overruled the *Hansen* test," *id.*, demonstrates that subsequent to *Robertson* and

*Randle*, *Hansen* was no longer the law in California.  The court then went on to overrule *Robertson*

and *Randle* as well.  *Id.* at 1201 ("We overrule *People v. Robertson*, *supra*, 34 Cal.4th 156, and the

reasoning, although not the result, of *People v. Randle*, *supra*, 35 Cal.4th 987.").  Thus, the merger

doctrine as it existed at the time of petitioner's conviction—articulated in *Robertson* and

*Randle*—was also overruled by *Chun*.  *Chun* therefore clarified the law subsequent to *Robertson* and

*Randle*, but prior to *Chun*; and also articulated a new rule subsequent to its issuance.  *Id.* at 1178

21

United States District Court

For the Northern District of California

1    (holding that "all assaultive-type crimes, such as a violation of *section 246*, merge with the charged

2    homicide and cannot be the basis for a second degree felony-murder instruction.").

3        The California Court of Appeal upheld petitioner's conviction for second degree murder by

4    distinguishing *Robertson* and *Randle*. *Leon*, 2006 WL 2988981 at *13.  The court then relied upon

5    *Hansen* and *Tabios* to uphold petitioner's conviction.  *Id.* at *12-14.  However, according to *Chun*,

6    the law at the time of petitioner's conviction was articulated in *Robertson* and *Randle*.  Under *Chun*,

7    a conviction for second degree murder cannot be based upon a finding that the killing occurred

8    during the commission of the felony of discharging a firearm into an occupied vehicle because that

9    felony merges with the homicide.  According to *Sandstrom v. Montana*, 442 U.S. 510, 526 (1979), a

10   due process violation occurs when the jury is instructed on a legally invalid theory.  Therefore, the

11   trial court and the Court of Appeal both erred because their adjudication of the claim resulted in a

12   decision that was contrary to, or involved an unreasonable application of, clearly established federal

13   law, as determined by the Supreme Court of the United States.  *See Fiore v. White*, 531 U.S. 225

14   (2001) (if the law as it exists at the time of conviction is later clarified, then the government's failure

15   to meet the requirements set forth in the clarification violates due process).  The trial court

16   erroneously instructed the jury on a non-viable theory of second degree murder, on which the jury

17   may have relied.  Indeed, unlike *Chun*, the jury here found petitioner guilty of the underlying felony.

18   This error is not harmless because the prosecution argued both implied malice second degree murder

19   and second degree felony-murder to the jury.  The record does not reveal which theory of second

20   degree murder was accepted by the jury; consequently, the felony-murder instructions may have had

21   a substantial influence on the conviction and there is a reasonable probability that, but for the

22   improper instructions, the result of the proceeding would have been different.  *Brecht v.*

23   *Abrahamson*, 507 U.S. 619, 637 (1993).  Petitioner's conviction for second degree murder is

24   therefore vacated.  Due to this holding, the court does not reach petitioner's collateral purpose and

25   equal protection claims.

26   ///

27   ///

28
                                        22

United States District Court
For the Northern District of California

1 ///

2 ///

3 CONCLUSION

4 Federal habeas relief is GRANTED in part.  Petitioner's conviction for second degree murder

5 is vacated.  The action is remanded to the state trial court for further proceedings not inconsistent

6 with this opinion.

7 IT IS SO ORDERED.

8 Dated: September 2, 2010

9 _____
MARILYN HALL PATEL

10 United States District Court Judge
Northern District of California

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## __ENDNOTES__

2   1.      The court is also not convinced by the record that a plausible argument of an attempted burglary
could be made, let alone one that threatened, or was reasonably believed to threaten death or serious
3   bodily harm.  The Court of Appeal also appears not to have been convinced of an attempted burglary
theory since it refers to the conduct as "the *asserted* attempted burglary."  *Leon*, 2006 WL 2988981 at
4   *3 (emphasis added).

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California